IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JUSTINE MATHEWS,                          :
                                          :
            Plaintiff,                    :
                                          :
    v.                                    :    C.A. No.
                                          :
MEDASSIST, INC,                           :    JURY TRIAL DEMANDED
                                          :
            Defendant.                    :

## COMPLAINT

Plaintiff Justine Mathews ("Mathews"), by and through her undersigned counsel, brings this Complaint against Defendant MedAssist, Inc. (the "Company") and alleges as follows:

### Introduction

1.      Mathews commences this action against the Company for compensatory, statutory and punitive damages, interest and costs of suit, including attorney's fees, for: (i) employment discrimination under applicable state law and Title VII of the Civil Rights Act; (ii) fraud; (iii) negligent misrepresentation; (iv) invasion of privacy; (v) violation of the Federal Electronic Communications Privacy Act, and specifically the Wiretap Act and Stored Communications Act contained therein; (vi) violation of the Computer Fraud and Abuse Act; and, (vii) violation of the Florida Security of Communications Act.

### Parties

2.      Mathews is an adult individual who resides in the State of Florida.  She had worked for the Company as an outside sales professional until August 12, 2005, at which point the Company illegally and improperly terminated her employment.

3.      The Company is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 1161 Lyndon Farm Court, Louisville, Kentucky.  The Company is a citizen of Delaware and Kentucky.

## Jurisdiction and Venue

4.      Subject matter jurisdiction is based upon a federal question in accordance with 28 U.S.C. § 1331 in that this matter involves claims under the laws of the United States.   In addition, subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between Mathews and the Company, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over the Company because it is incorporated in this district and regularly conducts business in this district.

6.      Venue lies in this district pursuant to 28 U.S.C. § 1391(a)(1), or (a)(3), and 28 U.S.C. § 1391(c) because Defendant is incorporated in and transacts business in this district and is subject to personal jurisdiction in this district.

## Facts

7.      Mathews is a 36-year-old woman who has spent most of her career as an outside sales representative working in the healthcare financial services industry.

8.      Mathews' employment at the Company began in late 2004 as the result of the Company acquiring her then current employer, Argent Healthcare Financial Services, Inc. ("Argent"). Like Argent, the Company provides financial services to healthcare institutions with an eye toward maximizing those institutions' reimbursement for services provided to patients.

9.      During her employment at Argent, Mathews had an exemplary employment record.  In September 2003, she rose to the position of Regional Director of Sales for Florida and the surrounding Southeastern states.  In this position, she had yearly earnings of approximately $150,000.00.   She remained as a Regional Director of Sales up through the time of the acquisition of Argent by the Company.

10.    As part of her transition into her employment with the Company after the acquisition, the Company presented Mathews in early December 2004 with what it initially termed as an "opportunity" to participate in a stock option plan as set out in a "Non-Qualified Stock Option Agreement" (the "Stock Option Agreement," attached hereto as Exhibit "A"). The Company characterized the Stock Option Agreement as a perquisite being extended to Mathews to entice her to stay on with the Company through the integration of Argent into the Company and for the foreseeable future thereafter. The salient discussions regarding the Stock Option Agreement were between Mathews and the Company's management, including Michael Shea ("Shea"), the Company's Chief Executive Officer; David Niswonger ("Niswonger"), the Company's Vice President of Sales; and William Bull ("Bull"), formerly Argent's Chief Executive Officer (but working for the Company in a different capacity).

11.    Notwithstanding the Company's characterization of the Stock Option Agreement as being a lucrative benefit being offered to her, Mathews immediately questioned the Company's motivation for offering her the Stock Option Agreement. Specifically, Mathews was concerned regarding language in the Stock Option Agreement that had no relation to the granting and vesting of stock options. Instead, the language appeared to limit Mathews' ability to seek employment with any of the Company's competitors if she left the Company or the Company terminated her for any reason.

12.    At the same time, the Stock Option Agreement provided Mathews no vested rights until, at the earliest, the second anniversary of the effective date of the proposed agreement.

13.    In sum, the Stock Option Agreement appeared to restrict upon execution Mathews' ability to seek employment elsewhere if she separated from the Company for any

reason, but at the same time the Stock Option Agreement provided Mathews no return benefit until two years later.

14.     Also of concern to Mathews in her consideration of her future with the Company was that her defined sales territory – parts of the Southeastern United States – now had sales employee redundancy as a result of the acquisition.  At least two employees whom the Company employed prior to the acquisition covered parts of the same territory that Mathews had covered exclusively for her previous employer, Argent.

15.     Because of these concerns, Mathews rejected the offered Stock Option Agreement.  In response, the Company instructed her that the execution of the Stock Option Agreement was no longer discretionary, but was a requirement of her continued employment with the Company.  Specifically, Shea communicated that all the Company's employees were required to execute some form of non-compete agreement.

16.     Recognizing the overlap in her sales territory, and growing concerned about her continued employment with the Company and the effect that the Stock Option Agreement would have on her ability to seek employment should she be let go, Mathews raised these issues with the Company's management.    Specifically, Mathews discussed these issues with Shea, Niswonger and Bull.  In response, the Company assured her that it was pleased with her performance and that it viewed her as an integral part of the Company's sales force going forward.

17.     Based upon these assurances, and under pressure to execute the Stock Option Agreement before leaving for a vacation during Christmas 2004, Mathews finally executed the Stock Option Agreement on Christmas Eve 2004.

18.     Soon after she executed the Stock Option Agreement, Mathews immediately began to notice that the Company was taking steps to cherry-pick accounts that she had

4

previously serviced for Argent and to shift those accounts to other sales representatives that had worked for the Company prior to the acquisition. Additionally, the Company began requiring Mathews to bring other sales people (again, those who had worked for the Company prior to the acquisition) with her on sales calls to accounts that Mathews had developed during her employment with Argent.

19.     In short, it became apparent to Mathews that the Company was taking steps to usurp the goodwill she had developed with these contacts while at Argent so the Company could service these accounts without her. The Company's efforts in this connection continued from the beginning of 2005 through the summer of that year.

20.     During this same time period, Mathews and her husband had been trying to have their first child. To this end, Mathews and her husband were religiously pursuing an *in vitro* fertilization program. The Company was well aware of the couple's efforts to conceive a child based upon discussions that Mathews had with her supervisor, Niswonger, the Company's Vice President of Sales. Additionally, after her termination Mathews learned that, unbeknownst to Mathews at the time, the Company was monitoring e-mails sent to a personal e-mail account maintained by Mathews. These personal e-mails included e-mails related to her and her husband's effort to conceive a child.

21.     In the early morning of August 12, 2005, Mathews was contacted by Niswonger. Niswonger demanded an emergency meeting that same day, at 12:30 p.m. at the Company's Tampa, Florida office. At that meeting, Niswonger, accompanied by Bull, communicated to Mathews that the Company was terminating her based upon an overlap of sales representatives in her territory. It was expressly stated to her that this was not a matter of performance, but that it was just a numbers issue.

22.     Also at this point, Niswonger shockingly commented, in the presence of Bull, that the termination should be welcomed as it would allow Mathews to focus on what was really important – her getting pregnant.  Mathews was astounded at Niswonger's casual reference to her efforts to conceive a child as somehow impacting on the termination.

23.     The Company's termination of Mathews was in complete contravention to what the Company told her to induce her to execute the Stock Option Agreement.

24.     Mathews, intending not to be bitter about the Company's decision, communicated that she would look past the Company's misrepresentations regarding her future with the Company as long as the Company gave her immediate assurances that she could accept a job with a competitor.

25.     Mathews knew that it was her relationships with the contacts at the institutions that drove the business to the Company, not any particular product of the Company. Accordingly, she was confident that she could quickly court a competitor to retain her services.

26.     In fact, competitors were prepared to immediately provide Mathews' employment assuming that they would not be subject to litigation instituted by the Company based upon the language of the Stock Option Agreement.  Despite numerous attempts to get the Company to make it clear that it did not intend to use the purported non-compete provisions to hinder Mathews' employment prospects, the Company purposely failed to provide Mathews with clarification regarding the Company's intended position as to the purported non-compete agreement.

27.     About a month after her termination, Mathews contacted Delaware legal counsel in connection with her desire to clarify her rights to seek employment and regarding a possible claim against the Company.  The Company was intentionally not providing her with a direct

answer regarding the non-compete language in an effort to taint her efforts to seek employment with competitors.

28.     Mathews communicated with counsel, in part, through a private e-mail address. Unbeknownst to Mathews, however, the Company was intercepting private e-mails sent to a private, non-company address at a point Mathews was no longer an employee of the Company. The intercepted e-mails included multiple instances of obvious attorney-client communications.

29.     Upon information and belief, the Company used Mathews' former Blackberry® to intercept the communications. Mathews had enabled the Blackberry® to receive e-mails from a personal e-mail address, but this function was supposed to be disabled when she returned the Blackberry® to the Company upon her termination.

30.     These communications involved or effected interstate commerce.

31.     Shockingly, Mathews learned of the intercepts – done weeks after her termination and relating to a clearly personal e-mail address – of these communications when MedAssist's Vice President of Human Resources, Jack Tindal, acknowledged in an e-mail to Mathews dated October 4, 2005 as follows: *"Justine, We were aware of Mr. Bellew prior to your email as you were communicating with him all along during this process by e-mail and the e-mails were being forwarded to your Blackberry® which was in our possession."* (Attached hereto as Exhibit "B".)

32.     On October 5, 2005, in response to a letter from Mathews' counsel, the Company finally conceded that the non-compete provisions were not enforceable. However, this was not before Mathews was damaged by the Company's failure to make this clear immediately upon her termination.

33.     Had the Company provided her with an assurance that it would not attempt to prevent her from seeking comparable employment immediately, which assurance Mathews could

7

have passed on to prospective employers, she would have been able to obtain a position within the same pay scale. Instead, she was forced to take a less lucrative position outside of her professional focus because it was clear that the job she accepted was not in competition with the Company. This fostered the Company's clear objective: keep Mathews out of the game.

### Causes of Action

<u>Count I – Employment Discrimination in Violation of Title VII – Sex Discrimination</u>

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

34.    Mathews has exhausted her federal administrative remedies and procedural requirements as to her claims under Title VII of the Civil Rights Act of 1964.

35.    On February 9, 2006 Mathews caused to be filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Kentucky Commission on Human Rights, alleging sex and pregnancy discrimination.

36.    On June 15, 2006 Mathews was issued a Notice of Right to Sue.

37.    The instant action is timely because it is initiated within ninety (90) days of receipt of the aforementioned Notice of Right to Sue.

38.    All conditions precedent regarding this count have been met.

39.    As described above, the Company's sex-based discrimination directed at Mathews had the purpose and/or effect of interfering with her work performance and employment with the Company.

40.    Mathews' sex did not prevent her from performing the duties of her job.

41.    The Company's above-referenced discrimination of Mathews based on her sex resulted in her discharge from the Company in violation of Title VII of the Civil Rights Act of 1964.

**8**

42.    The above-referenced actions were willful, malicious, in bad faith and outrageous.

43.    By reason of the Company's discriminatory practices, Mathews has been damaged in an amount to be determined at trial.

## Count II – Employment Discrimination
### in Violation of Title VII – Pregnancy Discrimination

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

44.    Mathews has exhausted her federal administrative remedies and procedural requirements as to her claims under Title VII of the Civil Right Act of 1964.

45.    On February 9, 2006, Mathews caused to be filed a Charge of Discrimination with the EEOC and the Kentucky Commission on Human Rights, alleging sex and pregnancy discrimination.

46.    On June 15, 2006, Mathews was issued a Notice of Right to Sue.

47.    The instant action is timely because it is initiated within ninety (90) days of receipt of the aforementioned Notice of Right to Sue.

48.    As described above, the Company's pregnancy-based discrimination directed at Mathews had the purpose and/or effect of interfering with her work performance and employment with the Company.

49.    Mathews pregnancy, or her capacity to become pregnant, would not and did not prevent her from performing the duties of her job.

50.    The Company's above-referenced discrimination of Mathews based on her pregnancy or capacity to become pregnant resulted in her discharge from the Company in Violation of title VII of the Civil Rights Act of 1964.

51.    The above-referenced actions were willful, malicious, in bad faith and outrageous.

9

52.    By reason of the Company's discriminatory practices, Mathews has been damaged in an amount to be determined at trial.


### Count III – Kentucky Civil Rights Act

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

53.    Mathews has exhausted her state administrative remedies and procedural requirements as to her claims under the Kentucky Civil Rights Act.

54.    The actions of the Company as aforesaid also violated the Kentucky Civil Rights Act.


### Count IV – Fraud

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

55.    As described above, the Company made false representations of fact to as its present intention to maintain Mathews' employment with the Company.

56.    The Company knew these representations to be false when they were made or permitted the representations to be made with reckless indifference to the truth.

57.    The Company's fraudulent representations were willful, wanton and/or malicious.

58.    The Company proffered these representations with the intent that Mathews would execute the Stock Option Agreement and continue her employment with the Company.

10

59.    Mathews executed the Stock Option Agreement and agreed to continued employment with the Company based upon the Company's representations made before and after she executed the Stock Option Agreement.

60.    By reason of the Company's fraudulent conduct in this matter, Mathews has been damaged in an amount to be determined at trial.

### Count V – Negligent Misrepresentation

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

61.    In negotiating the Stock Option Agreement, the Company negligently and without the use of reasonable care communicated materially false statements to Mathews and/or did not possess the present intent to perform its obligations when the representations were made.

62.    Mathews reasonably relied on the accuracy of the Company's materially false statements in deciding to execute the Stock Option Agreement, continuing her employment with the Company and turning away other employment opportunities of equal position.

63.    By reason of the Company's misrepresentations, Mathews has been damaged in an amount to be determined at trial.

### Count VI – Invasion of Privacy

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

64.    As described above, the Company intentionally intruded on Mathews' personal confidences and communications with her attorneys.

11

65.    Mathews maintained a reasonable expectation of privacy in her communications with her husband, her attorneys, and others.

66.    The Company's conduct of intercepting and reviewing Mathews' communications would be conduct deemed highly offensive by a reasonable person.

67.    By reason of the Company's invasion upon her privacy, Mathews has been damaged in an amount to be determined at trial.


### Count VII – Violation of the Wire Tap Act

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

68.    The Company intentionally, and without sufficient justification, authorization or privilege, intercepted the private, confidential and/or privileged electronic (email) communications between and amongst Mathews, Mathews' husband, her attorneys, and/or others.

69.    The Company intercepted these communications through the use of a handheld Blackberry® device for the purpose of ascertaining the substance of the communications.

70.    The Company's conduct violated 18 U.S.C. § 2510 *et seq.*

71.    By reason of the Company's unlawful interception of her electronic communications, Mathews has been damaged in an amount to be determined at trial.


### Count VIII – Violation of the Stored Communications Act

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

WILMINGTON\36478\1178190.000

72.    As described above, the Company intentionally (i) accessed or (ii) exceeded its authorized access of Mathews' personal, confidential and/or privileged email communications that may have been maintained or available of the Company's computers.

73.    The Company's conduct violated 18 U.S.C. § 2701 *et seq.*

74.    By reason of the Company's unlawful access of her electronic communications, Mathews has been damaged in an amount to be determined at trial.

### Count IX – Violation of the Computer Fraud and Abuse Act

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

75.    Alternatively, the Company, without authorization, obtained Mathews' personal, confidential and/or privileged email communications.

76.    The Company's conduct violated 18 U.S.C. § 1030 *et seq.*

77.    By reason of the Company's unauthorized and unlawful access of her electronic communications, Mathews has been damaged in an amount to be determined at trial.

### Count X – Violation of Florida's Security of Communications Act

Mathews repeats and realleges each allegation contained above as though fully set forth herein.

78.    The Company intentionally, and without sufficient justification, authorization or privilege, intercepted the private, confidential and/or privileged email communications between and amongst Mathews, Mathews' husband and/or her attorneys.

79.    The Company intercepted these communications through the use of a handheld Blackberry® device for the purpose of ascertaining the substance of the communications.

13

80.    The Company's conduct violated FLA. STAT. ch. 934.01 *et seq.*

81.    By reason of the Company's unlawful interception of her electronic communications, Mathews has been damaged in an amount to be determined at trial.

WHEREFORE, Mathews demands judgment against the Company as follows:

A.    an award of nominal, statutory (including, without limitation, back pay (with interest) and front pay), compensatory, and/or restitution damages, in an amount to be determined at trial,

B.    an award of punitive damages, statutory and/or other exemplary damages in an amount to punish and deter similar fraudulent and deceptive conduct in the future;

C.    an award of both pre- and post-judgment interest at the legal rate;

D.    an award of the costs and disbursements of this action, including reasonable counsel, accountants' and experts' fees, costs and expenses; and

E.    all such other and further relief as the Court deems just and proper under the circumstances.

Dated:  September 13, 2006

David A. Felice
Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013
*Attorneys for Plaintiff, Justine Mathews*

14

# EXHIBIT A

# MEDASSIST HOLDING, INC.
## 2003 STOCK OPTION PLAN

## SUMMARY PLAN DESCRIPTION

### Introduction

This Summary Plan Description is intended to briefly describe some of the most important general provisions of the MedAssist Holding, Inc. 2003 Stock Option Plan (the "Plan"), and to generally outline the tax consequences which may be associated with the grant and exercise of options under the Plan and the subsequent sale of shares acquired pursuant to options.

This Summary Plan Description does not contain all of the details and specific terms of the Plan, nor does it contain the details and terms of individual grants of options under the Plan to specific persons. This summary has been written to describe in a general manner circumstances and conditions relating to the Plan and options granted pursuant to the Plan and any Grant of Nonqualified Stock Option agreement between the Participant and the Company (a "Stock Option Agreement"). If there is any conflict between what is set forth in this summary and the language in the Plan or in any individual Stock Option Agreement, the Plan and such individual Stock Option Agreement will control.

### General Plan Information

*Purpose*

The Plan became effective on May 1, 2003. The purpose of the Plan is to provide additional incentive to persons who can make or are making, and can continue to make, substantial contributions to the growth and success of MedAssist Holding, Inc. (the "Company"), in order to attract and retain the employment and services of such persons and to encourage and reward such contributions, by providing these individuals (the "Participants") with an opportunity to acquire or increase stock ownership in the Company through the grant and exercise of options (the "Options") to purchase shares of the Company's non-voting common stock (the "Shares").

Options granted under the Plan will be "nonqualified stock options," which are options which do not qualify as "incentive stock options" as defined under Section 422 of the Internal Revenue Code.

*Administration*

The Plan is administered by the Board of Directors of the Company (the "Board"), although the Board may at a future date appoint a committee to administer the Plan.

The Board has full authority to administer and interpret the provisions of the Plan, including but not limited to the authority to make all determinations regarding grants of Options under the Plan, as described below. All decisions by the Board regarding the Plan are final and conclusive.

### Securities Offered

The maximum number of Shares that may be issued pursuant to the exercise of Options granted under the Plan is 1,200,000. This number is subject to adjustment to reflect changes in the capital structure or organization of the Company.

The specific terms of each grant of an Option to a Participant under the Plan are set forth in a Stock Option Agreement.

### Eligibility to Participate

Every employee, officer, director or consultant of the Company is eligible to participate in the Plan. The Board selects, from amongst such individuals, those persons to whom Options are to be granted, considering such factors as it deems relevant.

The Board, in its discretion, may grant Options to a Participant, even though stock, stock options, stock appreciation rights or other benefits previously were granted to such Participant by the Company or under another plan of the Company. The Plan does not confer any right on an individual to continue in the employ of the Company or to continue to provide services to the Company.

### Making of Grants

The Board, in its discretion, determines (i) the individuals to whom Options are to be granted, (ii) the time or times at which Options are to be granted, (iii) the price at which Options may be exercised, (iv) the exercise period of Options, (v) the time or times when Options will become vested and exercisable, and (vi) all other terms and conditions of Options.

A grant of an Option is effective only after the Participant signs the Stock Option Agreement provided by the Company and returns it to the Company. The Stock Option Agreement will describe all of the terms of the Option as determined by the Board, and provides all of the details concerning how the Participant may exercise the Option.

### Amendment and Termination

The Board may amend or suspend or terminate the Plan at any time. Termination or suspension of the Plan will not affect the rights of any Participant, except to the extent provided in the Stock Option Agreement with such Participant.

Any amendment that alters the terms or provisions of an existing Option will be effective only with the consent of the Participant (unless the alteration is expressly permitted under the Plan or the Stock Option Agreement).

**Tax Consequences**

This Summary Plan Description briefly summarizes most of the basic Federal rules (but not any state, local or foreign tax law rules as may be applicable), as in effect as of the date of this summary, relating to the tax consequences which may be associated with the grant and exercise of Options and the sale of Shares acquired pursuant to Options issued under the Plan. Such tax law rules, as set forth in the Internal Revenue Code, are complex and contain many conditions and exceptions that are not included in this summary.

Each Participant should consider consulting with a professional tax advisor of the Participant's choosing concerning the particular tax consequences resulting to the Participant in connection with the Participant's individual circumstances of Option grant and exercise and disposition of Shares. Further, it is advisable for a Participant to obtain such consultation prior to exercising an Option, disposing of Shares acquired pursuant to an Option or taking any other action relating to an Option.

*Tax Consequences on Grant*

There should be no Federal tax consequences to a Participant on grant of an Option. All grants of Options under the Plan will be nonqualified stock options.

*Tax Consequences on Exercise*

The difference between the value of the Shares at the time of exercise and the amount paid for the Shares (the "bargain element") is generally taxable to the Participant as additional compensation (*not* capital gain) in the year of exercise. In such event, the Participant must pay income tax on this additional amount of income, even though the Participant did not receive any cash at that time and may not have sold the Shares. The Company will also be entitled to withhold from you any amount due and payable by the Company to you the amount of any withholding or other tax due with respect to the Shares issuable under the Plan.

*Tax Consequences of Sale of Acquired Shares*

If a Participant exercises an Option, the Participant will generally have capital gain or loss (which may be long-term or short-term) when selling the Shares subject to the Option, based on the difference between the amount received in the sale and the Participant's tax basis. Tax basis generally is the amount paid for the Shares, increased by the amount that was treated as compensation income when the Participant exercised the Option.

**Additional Information**

The Company will provide to each Participant without charge, upon written request, a copy of the Plan document and copies of any other documents referenced by the Plan, this Summary Plan Description or the Participant's Stock Option Agreement. Requests for such copies, and any other information about the Plan and its administration, should be directed to the Corporate Secretary of MedAssist Holding, Inc. at 1661 Lyndon Farm Court, Louisville, Kentucky 40059 or such other address as the Company may designate.

## MEDASSIST HOLDING, INC.
## 2003 STOCK OPTION PLAN

### ARTICLE I

### Purpose of Plan

The 2003 Stock Option Plan (the "Plan") of MedAssist Holding, Inc. (the "Company"), adopted by the Board of Directors of the Company on May 1, 2003, for executives, directors, consultants and key employees of the Company, is intended to advance the best interests of the Company by providing those persons who have a substantial responsibility for its management and growth with additional incentives by allowing them to acquire an ownership interest in the Company and thereby encouraging them to contribute to the success of the Company and to remain in its employ or to continue to provide services to the Company. The availability and offering of stock options under the Plan also increases the Company's ability to attract and retain individuals of exceptional managerial talent upon whom, in large measure, the sustained progress, growth and profitability of the Company depends.

### ARTICLE II

### Definitions

For purposes of the Plan, except where the context clearly indicates otherwise, the following terms shall have the meanings set forth below:

"Board" shall mean the Board of Directors of the Company.

"Cause" shall mean (i) a Participant's theft or embezzlement, or attempted theft or embezzlement, of money or property of the Company, a Participant's perpetration or attempted perpetration of fraud, or a Participant's participation in a fraud or attempted fraud, on the Company or a Participant's unauthorized appropriation of, or a Participant's attempt to misappropriate, any tangible or intangible assets or property of the Company, (ii) any act or acts of disloyalty, misconduct or moral turpitude by a Participant injurious to the interest, property, operations, business or reputation of the Company or a Participant's conviction of a crime the commission of which results in injury to the Company or (iii) a Participant's failure or inability (other than by reason of Disability) to carry out effectively his duties and obligations to the Company or to participate effectively and actively in the management of the Company, as determined in the reasonable judgment of the Board.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute.

MedAssist Stock Option Plan (5-1-03).doc

"Committee" shall mean the committee of the Board which may be designated by the Board to administer the Plan. The Committee shall be composed of two or more directors as appointed from time to time to serve by the Board.

"Common Stock" shall mean the Company's Non-Voting Common Stock, par value $.01 per share, or if the outstanding Non-Voting Common Stock is hereafter changed into or exchanged for different stock or securities of the Company, such other stock or securities.

"Company" shall mean MedAssist Holding, Inc., a Delaware corporation, and (except to the extent the context requires otherwise) any subsidiary corporation of MedAssist Holding, Inc. as such term is defined in Section 425(f) of the Code.

"Disability" shall mean the inability, due to illness, accident, injury, physical or mental incapacity or other disability, of any Participant to carry out effectively his duties and obligations to the Company or to participate effectively and actively in the management of the Company for a period of at least 90 consecutive days or for shorter periods aggregating at least 120 days (whether or not consecutive) during any twelve-month period, as determined in the reasonable judgment of the Board.

"Fair Market Value" of the Common Stock shall be determined in good faith by the Committee or, in the absence of the Committee, by the Board.

"Participant" shall mean any executive, director, consultant or key employee of the Company who has been selected to participate in the Plan by the Committee or the Board.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Sale of the Company" shall mean the sale of the Company (whether by merger, consolidation, sale of all or substantially all of its assets or sale of all of its outstanding capital stock) to a Person who is not controlling, controlled by or under common control with any 5% owner of the Company's outstanding capital stock and who is not the spouse, ancestor or descendant (by birth or adoption) of any such 5% owner of the Company's capital stock.

## ARTICLE III

### Administration

The Plan shall be administered by the Committee; provided that if for any reason the Committee shall not have been appointed by the Board, all authority and duties of the Committee under the Plan shall be vested in and exercised by the Board. Subject to the limitations of the Plan, the Committee shall have the sole and complete authority to: (i) select Participants, (ii) grant Options (as defined in Article IV below) to Participants in such forms and amounts as it shall determine, (iii) impose such limitations, restrictions and conditions upon such Options as it shall deem appropriate, (iv) interpret the Plan and adopt, amend and rescind

administrative guidelines and other rules and regulations relating to the Plan, (v) correct any defect or omission or reconcile any inconsistency in the Plan or in any Option granted hereunder and (vi) make all other determinations and take all other actions necessary or advisable for the implementation and administration of the Plan. The Committee's determinations on matters within its authority shall be conclusive and binding upon the Participants, the Company and all other Persons. All expenses associated with the administration of the Plan shall be borne by the Company. The Committee may, as approved by the Board and to the extent permissible by law, delegate any of its authority hereunder to such persons as it deems appropriate.

## ARTICLE IV

### Limitation on Aggregate Shares

The number of shares of Common Stock with respect to which options may be granted under the Plan (the "Options") and which may be issued upon the exercise thereof shall not exceed, in the aggregate, 1,200,000 shares; provided that the type and the aggregate number of shares which may be subject to Options shall be subject to adjustment in accordance with the provisions of Section 6.8 below, and further provided that to the extent any Options expire unexercised or are canceled, terminated or forfeited in any manner without the issuance of Common Stock thereunder, such shares shall again be available under the Plan. The 1,200,000 shares of Common Stock available under the Plan may be either authorized and unissued shares, treasury shares or a combination thereof, as the Committee shall determine.

## ARTICLE V

### Awards

5.1    Options. The Committee may grant Options to Participants in accordance with this Article V.

5.2    Form of Option. Options granted under this Plan shall be nonqualified stock options and are not intended to be "incentive stock options" within the meaning of Section 422A of the Code or any successor provision.

5.3    Exercise Price. The option exercise price per share of Common Stock shall be fixed by the Committee at not less than 100% of the Fair Market Value of a share of Common Stock on the date of grant.

5.4    Exercisability. Options shall be exercisable at such time or times as the Committee shall determine at or subsequent to grant.

5.5    Payment of Exercise Price. Options shall be exercised in whole or in part by written notice to the Company (to the attention of the Company's Secretary) accompanied by payment in full of the option exercise price. Payment of the option exercise price shall be made in cash (including check, bank draft or money order) or, in the discretion of the Committee, by (i) delivery of a promissory note, (ii) surrendering Common Stock that has been owned by the

Participant for at least six months and that has a Fair Market Value equal to the exercise price, (iii) by delivery of an irrevocable undertaking by a broker to deliver promptly to the Company sufficient funds to pay the exercise price, or (iv) any combination of the foregoing (in each case, if in accordance with policies approved by the Board).

5.6    Terms of Options.    The Committee shall determine the term of each Option, which term shall in no event exceed ten years from the date of grant.

## ARTICLE VI

### General Provisions

6.1    Conditions and Limitations on Exercise.    Options may be made exercisable in one or more installments, upon the happening of certain events, upon the passage of a specified period of time, upon the fulfillment of certain conditions or upon the achievement by the Company of certain performance goals, as the Committee shall decide in each case when the Options are granted.

6.2    Sale of the Company.    In the event of a Sale of the Company, the Committee may provide, in its discretion, that the Options shall become immediately exercisable by any Participants who are employed by the Company at the time of the Sale of the Company and that such Options shall terminate if not exercised as of the date of the Sale of the Company or other prescribed period of time.

6.3    Written Agreement.    Each Option granted hereunder to a Participant shall be embodied in a written agreement (an "Option Agreement") which shall be signed by the Participant and by the Chairman or the Chief Executive Officer of the Company for and in the name and on behalf of the Company and shall be subject to the terms and conditions of the Plan prescribed in the Agreement (including, but not limited to, (i) the right of the Company and such other Persons as the Committee shall designate ("Designees") to repurchase from each Participant, and such Participant's transferees, all shares of Common Stock issued or issuable to such Participant on the exercise of an Option in the event of such Participant's termination of employment, (ii) rights of first refusal granted to the Company and Designees, (iii) holdback and other registration right restrictions in the event of a public registration of any equity securities of the Company and (iv) any other terms and conditions which the Committee shall deem necessary and desirable).

6.4    Listing, Registration and Compliance with Laws and Regulations. Options shall be subject to the requirement that if at any time the Committee shall determine, in its discretion, that the listing, registration or qualification of the shares subject to the Options upon any securities exchange or under any state or federal securities or other law or regulation, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition to or in connection with the granting of the Options or the issuance or purchase of shares thereunder, no Options may be granted or exercised, in whole or in part, unless such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee. The holders of such Options shall supply the

Company with such certificates, representations and information as the Company shall request and shall otherwise cooperate with the Company in obtaining such listing, registration, qualification, consent or approval. In the case of officers and other Persons subject to Section 16(b) of the Securities Exchange Act of 1934, as amended, the Committee may at any time impose any limitations upon the exercise of an Option that, in the Committee's discretion, are necessary or desirable in order to comply with such Section 16(b) and the rules and regulations thereunder. If the Company, as part of an offering of securities or otherwise, finds it desirable because of federal or state regulatory requirements to reduce the period during which any Options may be exercised, the Committee, may, in its discretion and without the Participant's consent, so reduce such period on not less than 15 days written notice to the holders thereof.

6.5    Nontransferability. Options may not be transferred other than by will or the laws of descent and distribution and, during the lifetime of the Participant, may be exercised only by such Participant (or his legal guardian or legal representative). In the event of the death of a Participant, exercise of Options granted hereunder shall be made only:

(i)    by the executor or administrator of the estate of the deceased Participant or the Person or Persons to whom the deceased Participant's rights under the Option shall pass by will or the laws of descent and distribution; and

(ii)    to the extent that the deceased Participant was entitled thereto at the date of his death, unless otherwise provided by the Committee in such Participant's Option Agreement.

6.6    Expiration of Options.

(a)    Normal Expiration. In no event shall any part of any Option be exercisable after the date of expiration thereof (the "Expiration Date"), as determined by the Committee pursuant to Section 5.6 above.

(b)    Early Expiration Upon Termination of Employment. Except as otherwise provided by the Committee in the Option Agreement, any portion of a Participant's Option that was not vested and exercisable on the date of the termination of such Participant's employment shall expire and be forfeited as of such date, and any portion of a Participant's Option that was vested and exercisable on the date of the termination of such Participant's employment shall expire and be forfeited as of such date, except that: (i) if any Participant dies or becomes subject to any Disability, such Participant's Option shall expire 180 days after the date of his death or Disability, but in no event after the Expiration Date, (ii) if any Participant retires (with the approval of the Board), his Option shall expire 90 days after the date of his retirement, but in no event after the Expiration Date, and (iii) if any Participant is discharged other than for Cause, such Participant's Option shall expire 30 days after the date of his discharge, but in no event after the Expiration Date.

6.7    Withholding of Taxes. The Company shall be entitled, if necessary or desirable, to withhold from any Participant from any amounts due and payable by the Company to such Participant (or secure payment from such Participant in lieu of withholding) the amount

of any withholding or other tax due from the Company with respect to any shares issuable under the Options, and the Company may defer such issuance unless indemnified to its satisfaction.

6.8    Adjustments.    In the event of a reorganization, recapitalization, stock dividend or stock split, or combination or other change in the shares of Common Stock, the Board or the Committee may, in order to prevent the dilution or enlargement of rights under outstanding Options, make such adjustments in the number and type of shares authorized by the Plan, the number and type of shares covered by outstanding Options and the exercise prices specified therein as may be determined to be appropriate and equitable.

6.9    Rights of Participants.    Nothing in this Plan or in any Option Agreement shall interfere with or limit in any way the right of the Company to terminate any Participant's employment at any time (with or without Cause), nor confer upon any Participant any right to continue in the employ of the Company for any period of time or to continue his present (or any other) rate of compensation, and except as otherwise provided under this Plan or by the Committee in the Option Agreement, in the event of any Participant's termination of employment (including, but not limited to, the termination by the Company without Cause) any portion of such Participant's Option that was not previously vested and exercisable shall expire and be forfeited as of the date of such termination.    No employee shall have a right to be selected as a Participant or, having been so selected, to be selected again as a Participant.

6.10    Amendment, Suspension and Termination of Plan.    The Board or the Committee may suspend or terminate the Plan or any portion thereof at any time and may amend it from time to time in such respects as the Board or the Committee may deem advisable; provided that no such amendment shall be made without stockholder approval to the extent such approval is required by law, agreement or the rules of any exchange upon which the Common Stock is listed, no such amendment, suspension or termination shall impair the rights of Participants under outstanding Options without the consent of the Participants affected thereby and, subject to Section 6.8, no such amendment shall increase the number of securities that may be issued by the Plan without the approval of the holders of at least 50% of the Common Stock. No Options shall be granted hereunder after the tenth anniversary of the adoption of the Plan.

6.11    Amendment, Modification and Cancellation of Outstanding Options.    The Committee may amend or modify any Option in any manner to the extent that the Committee would have had the authority under the Plan initially to grant such Option; provided that no such amendment or modification shall impair the rights of any Participant under any Option without the consent of such Participant.    With the Participant's consent, the Committee may cancel any Option and issue a new Option to such Participant.

6.12    Indemnification.    In addition to such other rights of indemnification as they may have as members of the Board or the Committee, the members of the Committee shall be indemnified by the Company against all costs and expenses reasonably incurred by them in connection with any action, suit or proceeding to which they or any of them may be party by reason of any action taken or failure to act under or in connection with the Plan or any Option granted thereunder, and against all amounts paid by them in settlement thereof (provided such settlement is approved by independent legal counsel selected by the Company) or paid by them in

satisfaction of a judgment in any such action, suit or proceeding; provided that any such Committee member shall be entitled to the indemnification rights set forth in this Section 6.12 only if such member has acted in good faith and in a manner that such member reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such conduct was unlawful, and further provided that upon the institution of any such action, suit or proceeding a Committee member shall give the Company written notice thereof and an opportunity, at its own expense, to handle and defend the same before such Committee member undertakes to handle and defend it on his own behalf.

* * * *

# MedAssist Holding, Inc.
# Management Stock Options

## Materials Prepared for:

### Justine Mathews

December 14, 2004

CONFIDENTIAL



CONFIDENTIAL

# MedAssist - Stock Option Value – 6,900 Options

**Value Per Share - MedAssist**

| | | | | | December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| **Management Plan** | **LTM EBITDA** | | | | | | | |
| | Exit Multiple | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | |
| | 7.5x | $1.34 | $7.03 | $10.93 | $15.70 | $20.81 | $26.95 | |
| | 8.5x | $1.34 | 8.80 | 13.12 | 18.39 | 24.00 | 30.73 | |
| | 9.5x | $1.34 | 10.56 | 15.32 | 21.08 | 27.19 | 34.51 | |

**Net Value of Stock Options - 6,900 Options**

| | | | | | December 31, | | | |
|---|---|---|---|---|---|---|---|---|
| **Management Plan** | **LTM EBITDA** | | | | | | | |
| | Exit Multiple | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | |
| | 7.5x | $0 | $39,283 | $66,201 | $99,078 | $134,377 | $176,742 | |
| | 8.5x | 0 | 51,454 | 81,315 | 117,629 | 156,367 | 202,812 | |
| | 9.5x | 0 | 63,626 | 96,428 | 136,179 | 178,356 | 228,881 | |

Notes: Net Value of Stock Options equals ("Value per Share" less option strike price of $1.34) x 6,900.
Assumes stock options are fully vested at each point in time.

2



## **EXERCISE NOTICE**

### **MEDASSIST HOLDING, INC.**
### **2003 STOCK OPTION PLAN**

Name: _____        Current Date: _____

Date of My Signature of My Stock Option Agreement: _____

Grant Date of My Option: _____

Number of Shares Being Purchased: _____

Exercise Price Per Share: $_____

Total Payment Required for Exercise: $_____

1.    Exercise of Option.  Effective as of the Current Date indicated above, I hereby notify MedAssist Holding, Inc. ("Company") that I elect to purchase the number of shares of the Company's non-voting common stock indicated above ("Shares"), under and pursuant to the MedAssist Holding, Inc. 2003 Stock Option Plan ("Plan") and my Stock Option Agreement ("Agreement") as referenced above.

2.    Payment for Purchase.  I have included with this Exercise Notice payment for my purchase of the Shares in the Total Payment Required for Exercise amount indicated above, by cash, check, bank draft or money order.

3.    Representations.

(a)    I understand and acknowledge that this exercise of my option is subject to all of the terms and conditions of the Plan and my Agreement, specifically including the provisions of the Plan prohibiting any transfer of Shares purchased by me until (i) there is a "Public Sale" or an "Approved Sale" of the Company (as defined in the Plan) (ii)  my termination from employment pursuant to the exercise of repurchase rights of either the Company or the Investors (as defined in the Plan) or (ii) as otherwise permitted by my Agreement, and that the certificate evidencing the Shares will be imprinted with a legend along the lines of the following:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____ __, 20__ HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE

UHDOCS 655710-1

ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN AN OPTION AGREEMENT BETWEEN THE COMPANY AND _____ DATED AS OF _____ ___, 20___, A COPY OF WHICH MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

I further understand and acknowledge that under the terms of my Agreement I am required to agree, and I do hereby agree, (i) to consent and raise no objection to such Approved Sale of the Company, (ii) if the Approved Sale of the Company is structured as a sale of stock, reverse merger or other transaction having the effect of a stock sale, to sell all of my Shares and rights to acquire Shares on the terms and conditions approved by the board of directors of the Company and the holders of a majority of the voting common stock then outstanding, and (iii) to take all necessary and desirable actions in connection with the consummation of the Approved Sale of the Company.

(b)     I understand and acknowledge that I will have no rights as a stockholder until the Shares to be purchased by me have been recorded on the Company's official stockholder records as having been issued or transferred to me pursuant to my exercise of my option; and that the Company will take action to record my purchase of the Shares on the Company's corporate stock ledger and to issue the appropriate stock certificate evidencing my ownership of the Shares as soon as practicable after the Company's receipt and acceptance of this Exercise Notice (and the Total Payment Required for Exercise).

(c)     I understand and agree that the Company may require me to pay to the Company or make arrangements for payment of amounts equal to taxes required to be withheld by the Company attributable to my exercise of my option. I acknowledge and agree that I am liable and responsible, and that the Company is not liable or responsible in any way, for any and all tax consequences to me relating to the exercise of my option.

(d)     I am sufficiently aware of the Company's business affairs and financial condition, and have acquired sufficient information about the Company, to have reached an informed and knowledgeable decision to exercise my option and purchase the Shares.

(e)     I am purchasing the Shares for my own account for investment purposes only, and not with a view to, or for sale in connection with, a distribution of any of the Shares.

(f)     I understand and acknowledge that the exercise of my right to purchase the Shares is expressly conditioned upon compliance with the all federal securities laws, all applicable state securities laws and all applicable requirements of any stock exchange or over-the-counter market on which the Company's stock may be listed or traded at the time of my

2

exercise of my option and my later transfer of any of the Shares acquired; and I agree to cooperate with the Company to ensure such compliance.

(g)    In connection with any public offering of the Company's securities, I agree not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any Shares during the seven days prior to and the 180 days after the effectiveness of any such registration, except as part of such underwritten registration if otherwise permitted.

(h)    I agree that, in order to ensure compliance with the securities law requirements and restrictions referenced herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, the Company may make appropriate notations to the same effect in its own records. I further understand and acknowledge that the Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of this Exercise Notice, my Agreement or the Plan or (ii) to treat as owner of such Shares or to accord the right to vote or to pay dividends to any purchaser or other transferee to whom such Shares have been so transferred.

(i)    I have reviewed and considered, and understand the significance and the reasons for my being provided with, the summaries of federal securities law requirements and restrictions set forth below in Part 4 of this Exercise Notice; and acknowledge that I have had sufficient opportunity to review and become familiar with the underlying securities law provisions and rules as referenced in such summaries of securities law requirements and restrictions and as may be applicable to my purchase of the Shares.

4.    Securities Law Requirements and Restrictions.

(a)    The Shares have not been registered under the Securities Act of 1933 ("Securities Act"), in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of investment intent expressed by purchaser.

(b)    The Shares must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available. Moreover, the Company is under no obligation to register the Shares. In addition, the certificate evidencing the Shares will be imprinted with the legend set forth in Part 3 above which prohibits the transfer of the Shares unless they are registered or such registration is not required. I agree not to sell or otherwise dispose of any Shares (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Company an opinion of counsel that registration under the Securities Act or any applicable state securities laws is not required in connection with such transfer.

(c)    The provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions.

(i)     Rule 701 provides that if the issuer qualifies under Rule 701 at the time of issuance of the Shares, such issuance will be exempt from registration under the Securities Act. In the event the Company later becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter the Shares exempt under Rule 701 may be resold, subject to the satisfaction of certain of the conditions specified by Rule 144, including among other things:  (1) the sale being made through a broker in an unsolicited "broker's transaction" or in a transaction directly with a "market maker", (2) the availability of certain public information about the Company, and (3) the amount of Shares being sold during any three month period not exceeding the limitations specified in Rule 144(e), if applicable.

(ii)    In the event that the Company does not qualify under Rule 701 at the time of issuance of the Shares, then the Shares may be resold in certain limited circumstances subject to the provisions of Rule 144, which require among other things: (1) the availability of certain public information about the Company, (2) the resale occurring not less than one year after the party has purchased, and made full payment for, within the meaning of Rule 144, the Shares to be sold, and (3) in the case of an affiliate, or of a non-affiliate who has held the securities less than two years, the sale being made through a broker in an unsolicited "broker's transaction" or in a transaction directly with a "market maker" and the amount of Shares being sold during any three month period not exceeding the specified limitations stated therein, if applicable.

(d)     In the event all of the applicable requirements of Rule 144 or Rule 701 are not satisfied, registration under the Securities Act, compliance with Regulation A or some other registration exemption will be required. Notwithstanding the fact that Rule 144 and Rule 701 are not exclusive, the Staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering, and otherwise than pursuant to Rule 144 or Rule 701, will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

SUBMITTED BY: _____
                                 (signature)


DATE: _____

| | [To be completed by Company] |
|---|---|
| RECEIVED BY COMPANY - | By: _____<br>Date: _____ |
| ACCEPTED BY COMPANY - | By: _____<br>Date: _____ |

# EXHIBIT B

## Bellew, Sean

| | |
|---|---|
| **From:** | Justine Mathews [justineM@kramergroup.com] |
| **Sent:** | Tuesday, October 04, 2005 9:47 AM |
| **To:** | Bellew, Sean |
| **Subject:** | FW: [Fwd: RE: RE: Justine Mathews - Separation from Employment] |

**Attachments:**    Jack Tindal (jtindal@medassistgroup.com).vcf



Jack Tindal
jtindal@medassist..
                Sean:

 Please see Jack's response to the emial I sent last night. I will call you shortly.

 -----Original Message-----
 From: j.mathews2@verizon.net [mailto:j.mathews2@verizon.net]
 Sent: Tuesday, October 04, 2005 9:46 AM
 To: Justine Mathews
 Subject: [Fwd: RE: RE: Justine Mathews - Separation from Employment]

 From: Jack Tindal <jtindal@medassistgroup.com>
 Date: Tue Oct 04 07:58:10 CDT 2005
 To: j.mathews2@verizon.net
 Cc: "'Birchfield, Thomas J.'" <TJB@gdm.com>,
     'Andrea Wenz' <awenz@medassistgroup.com>
 Subject: RE: RE: Justine Mathews - Separation from Employment

 Justine,

 We were aware of Mr. Bellew prior to your email as you were communicating with him all
 along during this process by email and the emails were being forwarded to your Blackberry
 which was in our possession. You may have your attorney communicate with Tom Birchfield
 via email as you've copied him on this email.

 Jack Tindal

 VP, Human Resources

 MEDASSIST

 1661 Lyndon Farm Court

 Louisville, KY  40223

 (502) 499-0855, ext. 3625

 (502) 515-2559 (fax)

 Email to:  jtindal@medassistgroup.com
 -----Original Message-----
 From: j.mathews2@verizon.net [mailto:j.mathews2@verizon.net]
 Sent: Monday, October 03, 2005 5:46 PM
 To: Jack Tindal; j.mathews2@verizon.net
 Cc: Mike Shea; 'David ?Niswonger'; 'Birchfield, Thomas J.'; sbellew@cozen.com
 Subject: Re: RE: Justine Mathews - Separation from Employment

   Jack:

 I received the "Agreement & Release document.  As you are aware this document does not
 address the outstanding issues.  I have tried to work this out between you and I,

                                    1

unfortunately we have been unsuccessful.
Therefore I have forwarded the proposed agreement to my attorney whose contact information
is listed below:

Sean Bellew
Cozen O'Conner
Suite 1400
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Phone: 302-295-2026
Fax: 302-295-2013
sbellew@cozen.com

I wish we could have worked this out but evidently it is now in the hands of the
attorneys.  Please provide MedAssist's attorney's contact information so that I may
forward it to Sean.


Justine

>From: Jack Tindal <jtindal@medassistgroup.com>
>Date: Fri Sep 30 07:50:33 CDT 2005
>To: j.mathews2@verizon.net
>Cc: Mike Shea <mshea@medassistgroup.com>,
 'David  Niswonger' <dniswonger@medassistgroup.com>,  "'Birchfield, Thomas J.'"
<TJB@gdm.com>
>Subject: RE: Justine Mathews - Separation from Employment

>Justine,
>
>The agreement (in its entirety) that the company will offer for your
>consideration was mailed to your home on Wednesday afternoon from our
>offices in Louisville. The agreement is the full and final agreement
>that the company will offer. Severance will not be considered.
>References will only be provided in accordance with company policy. I
>believe the agreement is self explanatory and should address any
further outstanding issues.
>
>Jack Tindal
>
>VP, Human Resources
>
>MEDASSIST
>
>1661 Lyndon Farm Court
>
>Louisville, KY  40223
>
>(502) 499-0855, ext. 3625
>
>(502) 515-2559
>
>Email to:  jtindal@medassistgroup.com
>-----Original Message-----
>From: j.mathews2@verizon.net [mailto:j.mathews2@verizon.net]
>Sent: Thursday, September 29, 2005 7:09 PM
>To: jtindal@medassistgroup.com
>Subject: Justine Mathews - Separation from Employment
>
>Jack:
>
>Attached is a letter addressing the outstanding issues relating to my
>employment separation.
>
>I look forward to hearing from you.
>
>Justine Mathews

>(863)698-9769

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

JUSTINE MATHEWS

**DEFENDANTS**

MEDASSIST, INC.

**(b)** County of Residence of First Listed Plaintiff    Polk County, Florida
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Sean J. Bellew/David A. Felice, Cozen O'Connor, 1201 N. Market Street, Suite 1400, Wilmington, DE 19801; (302) 295-2000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government
        Plaintiff

☒ 3   Federal Question
        (U.S. Government Not a Party)

☐ 2   U.S. Government
        Defendant

☐ 4   Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1   Original
        Proceeding

☐ 2   Removed from
        State Court

☐ 3   Remanded from
        Appellate Court

☐ 4   Reinstated or
        Reopened

☐ 5   Transferred from
        another district
        (specify)

☐ 6   Multidistrict
        Litigation

☐ 7   Appeal to District
        Judge from
        Magistrate
        Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):    42 U.S.C. § 2000e

Brief description of cause:  Plaintiff seeks damages for  defendant's Title VII violation (pregnancy and gender), invasion of privacy and related statutory and common law torts.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
     UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE

DOCKET NUMBER

DATE

13 September 2006

SIGNATURE OF ATTORNEY OF RECORD

David A. Felice (#4090)

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

0 6 - 5 7 4

Civil Action No. _____

## ACKNOWLEDGMENT
## OF RECEIPT FOR AO FORM 85

### *NOTICE OF AVAILABILITY OF A*
### *UNITED STATES MAGISTRATE JUDGE*
### *TO EXERCISE JURISDICTION*

2006 SEP 13 PM 4: 31

CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

I HEREBY ACKNOWLEDGE RECEIPT OF ____ 2 ____ COPIES OF AO FORM 85.

_____9-13-06_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Shane Handlin
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action

MedAssist Holding, Inc.
1661 Lyndon Farm Court
Louisville, KY 40223

December 14, 2004

Re:    MedAssist Holding, Inc. (the "Company") Grant of Nonqualified Stock Option

Dear Justine:

The Company is pleased to advise you that its Board of Directors has granted to you a stock option (an "Option"), as provided below, under the Company's 2003 Stock Option Plan (the "Plan"), a copy of which is attached hereto and incorporated herein by reference.

1.    Definitions. For the purposes of this Agreement, the following terms shall have the meanings set forth below:

"Affiliate" of any Person shall mean any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

"Board" shall mean the Board of Directors of the Company.

"Cause" shall mean (i) your theft or embezzlement, or attempted theft or embezzlement, of money or property of the Company, your perpetration or attempted perpetration of fraud, or your participation in a fraud or attempted fraud, on the Company or your unauthorized appropriation of, or your attempt to misappropriate, any tangible or intangible assets or property of the Company, (ii) any act or acts of disloyalty, misconduct or moral turpitude by you injurious to the interest, property, operations, business or reputation of the Company or your conviction of a crime the commission of which results in injury to the Company or (iii) your failure or inability (other than by reason of your Disability) to carry out effectively your duties and obligations to the Company or to participate effectively and actively in the management of the Company, as determined in the reasonable judgment of the Board.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute.

"Committee" shall mean the Stock Option Committee, or such other committee of the Board which may be designated by the Board to administer the Plan. The Committee shall be composed of two or more directors as appointed from time to time to serve by the Board. If for any reason the Committee shall not have been appointed by the Board, all authority and duties of the Committee under this Agreement shall be vested in and exercised by the Board.

MedAssist Stock Option Grant Agmt (01-03-05)

"Common Stock" means the Company's Voting Common Stock and Non-Voting Common Stock.

"Company" shall mean MedAssist Holding, Inc. a Delaware corporation, and (except to the extent the context requires otherwise) any subsidiary corporation of MedAssist Holding, Inc. as such term is defined in Section 425(f) of the Code.

"Disability" shall mean your inability, due to illness, accident, injury, physical or mental incapacity or other disability, to carry out effectively your duties and obligations to the Company or to participate effectively and actively in the management of the Company for a period of at least 90 consecutive days or for shorter periods aggregating at least 120 days (whether or not consecutive) during any twelve-month period, as determined in the reasonable judgment of the Board.

"Effective Date" shall mean December 14, 2004.

"Fair Market Value" of the Common Stock shall be determined by the Committee or, in the absence of the Committee, by the Board.

"Investor Stock" shall mean the Common Stock purchased by the Investors under that certain Purchase Agreement, dated as of May 1, 2003, by and among the Company and the Investors and that certain Securities Purchase Agreement, dated as of October 28, 2004, by and among the Company, the Investors and the other investors signatory thereto.

"Investors" shall mean RoundTable Healthcare Partners, L.P., a Delaware limited partnership, and RoundTable Healthcare Investors, L.P., a Delaware limited partnership, so long as each such Person continues to own shares of the Company's Common Stock.

"Non-Voting Common Stock" shall mean the Company's Non-Voting Common Stock, par value S.01 per share, or, in the event that the outstanding Non-Voting Common Stock is hereafter changed into or exchanged for different stock or securities of the Company, such other stock or securities.

"Option Shares" shall mean (i) all shares of Non-Voting Common Stock issued or issuable upon the exercise of the Option and (ii) all shares of Common Stock issued with respect to the Non-Voting Common Stock referred to in clause (i) above by way of stock dividend or stock split or in connection with any conversion, merger, consolidation or recapitalization or other reorganization affecting the Common Stock. Option Shares shall continue to be Option Shares in the hands of any holder other than you (except for the Company or the Investors and, to the extent that you are permitted to Transfer Option Shares pursuant to Section 14 or 16 hereof, purchasers pursuant to a public offering under the Securities Act), and each such transferee thereof shall succeed to the rights and obligations of a holder of Option Shares hereunder.

"Permitted Transferee" means your spouse and descendants (whether natural or adopted) and any trust or family limited partnership established solely for your benefit an/or the benefit of your spouse and/or descendants, but only if such Persons are not engaging in

competition with the Company or its Subsidiaries (as determined by the Board in its sole discretion).

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Public Sale" means any sale of Option Shares to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act.

"Registration Agreement" shall mean that certain Registration Agreement, dated as of May 1, 2003, by and among the Company and certain investors as amended from time to time.

"Sale of the Company" shall mean the sale of the Company (whether by merger, consolidation, sale of all or substantially all of its assets or sale of all of its outstanding capital stock) to a Person who is not controlling, controlled by or under common control with any 5% owner of the Company's outstanding capital stock and who is not the spouse, ancestor or descendant (by birth or adoption) of any such 5% owner of the Company's capital stock.

"Securities Act" shall mean the Securities Act of 1933, as amended, and any successor statute.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Transfer" means any sale, transfer, assignment, pledge or other disposition of (whether with or without consideration and whether voluntarily or involuntarily or by operation of law) any interest in such Person's Option Shares.

"Voting Common Stock" shall means the Company's Voting Common Stock, par value $.01 per share, or, in the event that outstanding Voting Common Stock is hereafter changed into or exchanged for different stock or securities of the Company, such other stock or securities.

2.    Option.

(a)    Terms. Your Option is for the purchase of up to 6,900 shares of Non-Voting Common Stock (the "Option Shares") at a price per share of $1.34 (the "Exercise Price"), payable upon exercise as set forth in Section 2(b) below. Your Option shall expire at the close of business on December 14, 2014 (the "Expiration Date"), subject to earlier expiration as provided in Section 3(c) below or upon termination of your employment as provided in Section 4(b) below. Your Option is not intended to be an "incentive stock option" within the meaning of Section 422A of the Code.

(b)    Payment of Option Price. Subject to Section 3 below, your Option may be exercised in whole or in part upon payment of an amount (the "Option Price") equal to the product of (x) the Exercise Price multiplied by (y) the number of Option Shares to be acquired. Payment shall be made in cash (including check, bank draft or money order) or, in the discretion of the Committee, by (i) delivery of a promissory note, (ii) surrendering Non-Voting Common Stock that you have owned for at least six months and that has a Fair Market Value equal to the exercise price, (iii) delivery of an irrevocable undertaking by a broker to deliver promptly to the Company sufficient funds to pay the exercise price, or (iv) any combination of the foregoing (in each case, if in accordance with policies approved by the Board).

3.    Exercisability/Vesting.

(a)    Normal Vesting. Your Option may be exercised only to the extent it has become vested. Your Option shall fully vest and become exercisable with respect to all of your Option Shares on the fifth anniversary of the Effective Date, if and only if you are, and have been, continuously employed by the Company from the Effective Date through the fifth anniversary of the Effective Date.

Notwithstanding the foregoing, your Option shall vest and become exercisable with respect to 25% of your Option Shares (rounded to the nearest whole share) on the second, third, and fourth anniversaries of the Effective Date, respectively, if and only if you are, and have been, continuously employed by the Company from the Effective Date through the second, third and fourth anniversaries, as applicable.

(b)    Effect on Vesting in Case of Employment Termination. Notwithstanding Section 3(a) above, the following special vesting rules shall apply if your employment with the Company terminates prior to the Expiration Date:

(i)    Death or Disability. If you die or become subject to any Disability while an employee of the Company, your Option shall be vested and become fully exercisable with respect to a number of Option Shares equal to the sum of (x) the Option Shares that were exercisable on the date of your death or Disability, plus (y) 25% of the

Option Shares that were not exercisable on the date of your death or Disability. Your Option with respect to the remaining Option Shares that were not exercisable on the date of your death or Disability shall expire and be forfeited.

(ii)     Retirement.  If you retire (with the approval of the Committee or the Board) from employment with the Company, your Option shall be vested and fully exercisable with respect to that portion of your Option that was exercisable on the date of your retirement.  Any portion of your Option that was not exercisable on the date of your retirement shall expire and be forfeited.

(iii)    Other Termination of Employment.  Unless otherwise determined by the Committee, if your employment terminates other than as a result of death, Disability, retirement (with the approval of the Committee or the Board), resignation or discharge for Cause, your Option shall be vested and fully exercisable with respect to that portion of your Option that was vested and exercisable on the date your employment with the Company ceased and any portion of your Option that was not vested and exercisable on such date shall expire and be forfeited.  If you resign or are discharged for Cause, all of your Option not previously exercised shall expire and be forfeited whether exercisable or not.

Except as provided in this Section 3(b), the number of Option Shares with respect to which your Option may be exercised shall not increase once you cease to be employed by the Company.

(c)     Acceleration of Vesting on Sale of the Company.  If you have been continuously employed by the Company from the Effective Date until a Sale of the Company, the portion of your outstanding Option which has not become vested at the date of such event shall, at Board's sole discretion, immediately vest and become exercisable with respect to 100% of the Option Shares simultaneously with the consummation of the Sale of the Company.  In any event, any portion of your Option which has not been exercised prior to or in connection with the Sale of the Company shall be forfeited, unless otherwise determined by the Committee or the Board.

4.    Expiration of Option.

(a)    Normal Expiration.    In no event shall any part of your Option be exercisable after the Expiration Date set forth in Section 2(a) above.

(b)    Early Expiration Upon Termination of Employment. Any portion of your Option that was not vested and exercisable on the date your employment with the Company terminated shall expire and be forfeited on such date, and any portion of your Option that was vested and exercisable on the date your employment with the Company terminated shall also expire and be forfeited; provided that: (i) if you die or become subject to any Disability, the portion of your Option that is vested and exercisable shall expire 180 days from the date of your death or Disability, but in no event after the Expiration Date, (ii) if you retire (with the approval of the Committee or the Board), the portion of your Option that is vested and exercisable shall expire 90 days from the date of your retirement, but in no event after the Expiration Date, and

(iii) if you are discharged other than for Cause, the portion of your Option that is vested and exercisable shall expire 30 days from the date of your discharge, but in no event after the Expiration Date.

5.     Procedure for Exercise.  You may exercise all or any portion of your Option, to the extent it has vested and is outstanding, at any time and from time to time prior to its expiration, by delivering written notice to the Company (to the attention of the Company's Secretary) and your written acknowledgement that you have read and have been afforded an opportunity to ask questions of management of the Company regarding all financial and other information provided to you regarding the Company, together with payment of the Option Price in accordance with the provisions of Section 2(b) above.  As a condition to any exercise of your Option, you shall permit the Company to deliver to you all financial and other information regarding the Company it believes necessary to enable you to make an informed investment decision, and you shall make all customary investment representations which the Company requires.

6.     Securities Laws Restrictions and Other Restrictions on Transfer of Option Shares.  You represent that when you exercise your Option you shall be purchasing Option Shares for your own account and not on behalf of others.  You understand and acknowledge that federal and state securities laws govern and restrict your right to offer, sell or otherwise dispose of any Option Shares unless your offer, sale or other disposition thereof is registered under the Securities Act and state securities laws, or in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder.  You agree that you shall not offer, sell or otherwise dispose of any Option Shares in any manner which would: (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law) or to amend or supplement any such filing or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other state or federal law.  You further understand that the certificates for any Option Shares you purchase shall bear such legends as the Company deems necessary or desirable in connection with the Securities Act or other rules, regulations or laws.

7.     Non-Transferability of Option.  Your Option is personal to you and is not transferable by you other than by will or the laws of descent and distribution.  During your lifetime only you (or your guardian or legal representative) may exercise your Option.  In the event of your death, your Option may be exercised only (i) by the executor or administrator of your estate or the person or persons to whom your rights under the Option shall pass by will or the laws of descent and distribution and (ii) to the extent that you were entitled hereunder at the date of your death.

8.     Conformity with Plan.  Your Option is intended to conform in all respects with, and is subject to all applicable provisions of, the Plan (which is incorporated herein by reference).  Inconsistencies between this Agreement and the Plan shall be resolved in accordance with the terms of the Plan.  By executing and returning the enclosed copy of this Agreement, you acknowledge your receipt of this Agreement and the Plan and agree to be bound by all of the terms of this Agreement and the Plan.

MedAssist Stock Option Grant Agmt (01-03-05)          -6-

9.    Rights of Participants. Nothing in this Agreement shall interfere with or limit in any way the right of the Company to terminate your employment at any time (with or without Cause), nor confer upon you any right to continue in the employ of the Company for any period of time or to continue your present (or any other) rate of compensation, and in the event of your termination of employment (including, but not limited to, termination by the Company without Cause) any portion of your Option that was not previously vested and exercisable shall be forfeited. Nothing in this Agreement shall confer upon you any right to be selected again as a Plan participant, and nothing in the Plan or this Agreement shall provide for any adjustment to the number of Option Shares subject to your Option upon the occurrence of subsequent events except as provided in Section 11 below.

10.    Withholding of Taxes. The Company shall be entitled, if necessary or desirable, to withhold from you from any amounts due and payable by the Company to you (or secure payment from you in lieu of withholding) the amount of any withholding or other tax due from the Company with respect to any Option Shares issuable under this Plan, and the Company may defer such issuance unless indemnified by you to its satisfaction.

11.    Adjustments. In the event of a reorganization, recapitalization, stock dividend or stock split, or combination or other change in the shares of Common Stock, the Board or the Committee may, in order to prevent the dilution or enlargement of rights under your Option, make such adjustments in the number and type of shares authorized by the Plan, the number and type of shares covered by your Option and the Exercise Price specified herein as may be determined to be appropriate and equitable.

12.    Right to Purchase Option Shares Upon Your Termination of Employment.

(a)    Repurchase of Option Shares. If your employment with the Company shall terminate, including upon your death, Disability, resignation or termination with or without Cause (the date on which such termination occurs being referred to as the "Termination Date"), then the Company shall have the option to repurchase all or any part of the Option Shares issued or issuable upon exercise of your Option, whether held by you or by one or more of your transferees, at the price determined in accordance with the provisions of Section 13 hereof (the "Repurchase Option").

(b)    Repurchase by Company. The Company may elect to purchase all or any portion of the Option Shares by delivery of written notice (the "Repurchase Notice") to you or any other holders of the Option Shares within 90 days after the Termination Date. The Repurchase Notice shall set forth the number of Option Shares to be acquired from you and such other holder(s), the aggregate consideration to be paid for such shares and the time and place for the closing of the transaction. The number of Option Shares to be repurchased by the Company shall first be satisfied to the extent possible from the Option Shares held by you at the time of delivery of the Repurchase Notice. If the number of Option Shares then held by you is less than the total number of Option Shares the Company has elected to purchase, then the Company shall purchase the remaining shares elected to be purchased from the other holders thereof, pro rata according to the number of shares held by each such holder at the time of delivery of such Repurchase Notice (determined as close as practical to the nearest whole shares).

(c)     Repurchase by Investors.  If for any reason the Company does not elect to purchase all of the Option Shares pursuant to the Repurchase Option, then the Investors shall be entitled to exercise the Company's Repurchase Option in the manner set forth in Section 12(a) for all or any portion of the number of Option Shares the Company has not elected to purchase (the "Available Shares").  As soon as practicable after the Company has determined that there shall be Available Shares, but in any event within 60 days after the Termination Date, the Company shall deliver written notice (the "Option Notice") to the Investors setting forth the number of Available Shares and the price for each Available Share.  Each Investor may elect to purchase any number of Available Shares by delivering written notice to the Company within 30 days after receipt of the Option Notice from the Company.  If more than one Investor elects to purchase the Available Shares and such elections exceed the number of Available Shares, the number of Available Shares to be purchased by the electing Investors shall be allocated among them pro rata based upon their relative percentage ownership of Investor Stock.  As soon as practicable, and in any event within five days after the expiration of such 30-day period, the Company shall notify you and any other holder(s) of Option Shares as to the number of Option Shares being purchased from you by the Investors (the "Supplemental Repurchase Notice").  At the time the Company delivers the Supplemental Repurchase Notice to you and such other holder(s) of Option Shares, the Investors shall also receive written notice from the Company setting forth the number of shares it is entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction.

(d)     Closing of Repurchase of Option Shares.  The purchase of Option Shares pursuant to this Section 12 shall be closed at the Company's executive offices within 20 days after the expiration of the 90-day period referred to in Section 12(b).  At the closing, the purchaser or purchasers shall pay the purchase price in the manner specified in Section 13(b) and you and any other holders of Option Shares being purchased shall deliver the certificate or certificates representing such shares to the purchaser or purchasers or their nominees, accompanied by duly executed stock powers.  Any purchaser of Option Shares under this Section 12 shall be entitled to receive customary representations and warranties from you and any other selling holders of Option Shares regarding the sale of such shares (including representations and warranties regarding good title to such shares, free and clear of any liens or encumbrances) and to require all sellers' signatures to be guaranteed by a national bank or reputable securities broker.

13.     Purchase Price for Option Shares.

(a)     Purchase Price.  The purchase price per share to be paid for the Option Shares purchased by the Company and the Investors pursuant to Section 12 shall be equal to the Fair Market Value of such Option Shares as of the Termination Date.

(b)     Manner of Payment.  If the Company elects to purchase all or any part of the Option Shares, including Option Shares held by one or more transferees, the Company shall pay for such shares by, at its option: (i) a check or wire transfer of funds to the extent such payment would not cause the Company to violate the General Corporation Law of the State of Delaware and would not cause the Company to breach any agreement to which it is a party relating to the indebtedness for borrowed money or other material agreement; (ii) a subordinated

promissory note of the Company bearing interest (payable quarterly in cash unless otherwise prohibited) at the rate of 6% per annum, with a principal payment due on the fifth anniversary of the date of issuance and which shall be subordinated on terms and conditions satisfactory to the holders of the Company's indebtedness for borrowed money; or (iii) a combination of (i) and (ii) above in such proportions as the Company may determine in its sole discretion. In addition, the Company may pay the purchase price for such shares by offsetting amounts outstanding under any indebtedness or obligations owed by you to the Company. If any Investors elect to purchase all or any portion of the Available Shares, such Investors shall pay for that portion of such Option Shares by check or wire transfer of funds.

14.    Restrictions on Transfer.

(a)    With respect to each Option Share issued pursuant to this Agreement, until the third anniversary of the date of the issuance of such Option Share, you shall not Transfer any interest in such Option Share except pursuant to the provisions of Section 14 below (in an Approved Sale). After the third anniversary of the date of issuance and prior to the fifth anniversary of the date of issuance, you shall not Transfer any interest in such Option Share except (a) pursuant to the immediately preceding sentence or (b) to your Permitted Transferees. After the fifth anniversary of the date of issuance, you shall not Transfer any interest in such Option Share except (a) pursuant to the immediately preceding sentence (each, an Exempt Transfer") or (b) pursuant to a Transfer consummated in compliance with the terms of this Section 14 hereof to Persons that are not engaging in competition with the Company or its Subsidiaries (as determined by the Board in its reasonable discretion).

(b)    Transfer of Option Shares. At least 30 days prior to making any Transfer other than an Exempt Transfer, you shall deliver a written notice (the "Sale Notice") to the Company and the Investors. The Sale Notice shall disclose in reasonable detail the identity of the prospective transferee(s) and the terms and conditions of the proposed Transfer. You agree not to consummate any such Transfer until 30 days after the Sale Notice has been delivered to the Company and the Investors, unless the parties to the Transfer have been finally determined pursuant to this Section 14 prior to the expiration of such 30-day period. (The date of the first to occur of such events is referred to herein as the "Authorization Date").

(c)    First Refusal Rights. The Company may elect to purchase all (but not less than all) of the Option Shares to be transferred by you upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to you within 20 days after the receipt of the Sale Notice by the Company. If the Company has not elected to purchase all of the Option Shares to be transferred, then the Investors may elect to purchase all (but not less than all) of the Option Shares to be transferred upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to you within 30 days after the receipt of the Sale Notice by the Investors. Any person who has the right to acquire Option Shares pursuant to this Section 14(b) shall be given up to 30 days (after it has been determined that such person has such right) to consummate the purchase and sale of Option Shares. If more than one Investor Stockholder elects to purchase the Option Shares specified in the Sale Notice and such elections exceed the number of remaining shares, then the number of Option Shares to be purchased by the electing Investors shall be allocated among them pro rata

based upon their relative percentage ownership of Investor Stock. If neither the Company nor any Investor Stockholder has elected to purchase all of the Option Shares specified in the Sale Notice, you may Transfer the Option Shares specified in the Sale Notice at a price and on terms no more favorable to the transferee(s) thereof than specified in the Sale Notice during the 60-day period immediately following the Authorization Date. Any Option Shares not transferred within such 60-day period shall be subject to the provisions of this Section 14(b) upon subsequent Transfer.

(d)    Termination of Restrictions. The restrictions on the Transfer of Option Shares set forth in Sections 14(b) and 14(c) shall terminate on the earlier to occur of (i) the date on which such Option Share has been transferred in a Public Sale, (ii) the consummation of an Approved Sale and (iii) the date on which such Option Share has been transferred pursuant to Section 14(c) above.

15.    Additional Restrictions on Transfer.

(a)    Restrictive Legend. When issued upon the valid exercise of your Option pursuant to the terms and conditions hereof, the certificates representing the Option Shares shall bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____ __, 20__ HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.    THE    SECURITIES    REPRESENTED    BY    THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN AN OPTION AGREEMENT BETWEEN THE COMPANY AND _____ EFFECTIVE AS OF MAY 1, 2003, A COPY OF WHICH MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(b)    Opinion of Counsel. You may not Transfer any Option Shares (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Company an opinion of counsel reasonably acceptable in form and substance to the Company that registration under the Securities Act or any applicable state securities law is not required in connection with such Transfer.

(c)    Holdback. You agree not to effect any public sale or distribution of any equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, during the seven days prior to and the 180 days after the effectiveness of any underwritten Demand Registration or any underwritten Piggyback

Registration (as such terms are defined in the Registration Agreement), except as part of such underwritten registration if otherwise permitted.

16.    Sale of the Company.

(a)    Consent to Sale of Company. If the Board and the holders of a majority of the Company's Voting Common Stock then outstanding approve a Sale of the Company (the "Approved Sale"), you shall consent to and raise no objections against the Approved Sale of the Company, and if the Approved Sale of the Company is structured as a sale of stock, reverse merger, or other transaction having the effect of a stock sale, you shall agree to sell all of your Option Shares and rights to acquire Option Shares on the terms and conditions approved by the Board and the holders of a majority of the Voting Common Stock then outstanding. You shall take all necessary and desirable actions in connection with the consummation of the Approved Sale of the Company.

(b)    Purchaser Representative.    If the Company or the holders of the Company's securities enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), you shall, at the request of the Company, appoint a purchaser representative (as such term is defined in Rule 501) reasonably acceptable to the Company. If you appoint the purchaser representative designated by the Company, the Company shall pay the fees of such purchaser representative, but if you decline to appoint the purchaser representative designated by the Company you shall appoint another purchaser representative (reasonably acceptable to the Company), and you shall be responsible for the fees of the purchaser representative so appointed.

(c)    Termination of Restrictions.    The provisions of this Section 16 shall terminate when the Company has sold shares of its Common Stock pursuant to a public offering registered under the Securities Act.

17.    Restrictive Covenants.

(a)    Non-Disclosure of Confidential Information.    You will not at any time (other than disclosures to other employees, officers and/or directors of the Company, or as may be required or appropriate directly in connection with your performance of your regular employment duties), directly or indirectly, use, communicate, disclose or disseminate any Confidential Information (defined below) in any manner whatsoever (except as may be required under legal process by subpoena or other court order). You agree to take all appropriate steps (and cause each of your Affiliates to take all appropriate steps) to safeguard such Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. If you are requested or becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigation demand, or similar process) or are required by a regulatory body to make any disclosure that is prohibited or otherwise constrained by this Agreement, you will provide the Company with prompt notice of such request so that the Company may seek an appropriate protective order or other appropriate remedy. Subject to the foregoing, you may furnish that portion (and only that portion) of the Confidential

Information, that in the written opinion of your counsel reasonably acceptable to the Company, you are legally compelled or are otherwise required to disclose or else stand liable for contempt or suffer other material censure or material penalty; provided, however, that you must use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any Confidential Information so disclosed.

(b)    "Confidential Information" Defined.    For purposes of this Agreement, "Confidential Information" means information relating to the present or planned business of the Company, or any of its divisions, Subsidiaries or Affiliates, unless and to the extent that the Confidential Information becomes generally known to and available for use by the public other than as a result of your acts or omissions.    You understand and agree that Confidential Information also includes, but is not limited to, the Company's, or any of its divisions', Subsidiaries' or Affiliates' business methods, company/employee manuals, client fee arrangements, management practices, advertisement techniques, market development projects, the relationships with various clients and potential clients, Trade Secrets (defined below) and know-how, Inventions (defined below), research, development, marketing and sales programs, customer, patient and supplier information, financial data, pricing information, manufacturing processes and techniques, regulatory approval strategies, computer programs, data, formulae and compositions, service techniques and protocols, and new product designs, anything derived from or based upon any of the foregoing and any information received by the Company, or any of its divisions, Subsidiaries or Affiliates, under an obligation of confidentiality to a third party.

For purposes of this Agreement, "Invention" means both patentable and unpatentable procedures, uses, apparatuses, compositions or matter, designs, or configurations, computer programs of any kind, discovered, conceived, reduced to practice, developed, made or produced, or any improvements to them.    "Items" include documents, reports, drawings, photographs, designs, specifications, formulae, plans, samples, research or development information, prototypes, tools, equipment, computers, printers, monitors and associated other computer-related equipment, software, proposals, marketing or sales plans, customer information, customer lists, patient lists, patient information, regulatory files, financial data, costs, pricing information, supplier information, written, printed or graphic matter, or other information or materials that concern the Company's, or its divisions', Subsidiaries' or Affiliates', business and that come into your possession or about which you have knowledge by reason of your employment with the Company.    "Trade Secrets" include all information encompassed in all Items, and in all manufacturing processes, methods of production, concepts or ideas, to the extent that such information has not been released publicly by duly authorized representatives of the Company.

(c)    · Non-Competition, Non-Solicitation and Related Covenants.    You acknowledge and agree that the Company would be irreparably damaged if you were to compete with the Company or provide services to any person or entity competing with the Company or engaged in a similar business and that such competition by you would result in a significant loss of goodwill by the Company. You further acknowledge and agree that the covenants set forth in this Section 17 were a material inducement to the Company to enter into this Agreement and that the Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if you breached the provisions of this Section 17.

Therefore, during your employment with the Company and for a period of two years thereafter (the "Restricted Period") regardless of whether you were terminated for cause or not), without the express, prior written consent of the Company, you shall not engage in any of the conduct described in subsections (i)-(v) below, either directly or indirectly, individually or as an employee, contractor, consultant, partner, member, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly traded corporation) or in any other capacity for any person, firm, partnership, limited liability company or corporation:

        (i)     engage in, participate in, or permit your name to be used by any enterprise engaging in or participating in the business of patient eligibility, accounts receivable management and collection services to the health care industry, and any other industry in which the Company conducts business in the United States;

        (ii)    induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way materially interfere with the relationship between the Company or any Subsidiary and any employee thereof, in each case, except as otherwise consistent with your regular employment duties prior to the termination of your employment;

        (iii)   hire any person who was an employee of the Company or any Subsidiary at any time during the six-month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the parties that any such hiring within such twelve-month period is in violation of this clause (ii) above);

        (iv)   call on, solicit or service any customer, supplier, independent contractor or other business relation of the Company or any Subsidiary in order to induce or attempt to induce such customer, supplier, independent contractor or other business relation to cease doing business with the Company or any Subsidiary, or in any way materially interfere with the relationship between any such customer, supplier, independent contractor or business relation and the Company or any Subsidiary (including any disparaging statements about the Company or any Subsidiary), in each case, except as otherwise consistent with your regular employment duties prior to the termination of your employment; or

        (v)    participate voluntarily with or provide assistance or information to any person or entity that is involved in a potential or existing business or legal dispute with the Company, its divisions, Subsidiaries or Affiliates, including, but not limited, to litigation, except as may be required by law. In the event you receive a complaint or subpoena or other legal process relating to your employment with the Company, you, within seven days of receipt and prior to your response, shall give written notice to the Company as provided in Section 26 below.

        (d)    Reasonable Limitations.  The parties hereto stipulate and agree that each of the terms of Section 17 of this Agreement including, but not limited to, the scope of the activities prohibited and the time limitation, is reasonable.  You further stipulate that the

foregoing restrictions will not prevent you from obtaining gainful employment in your occupation or file of expertise or cause you undue hardship.

18.     Remedies.     The parties hereto (and the Investors as third-party beneficiaries) shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor.   The parties hereto acknowledge and agree that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party hereto (and any Investor Stockholder as a third-party beneficiary) may, in its sole discretion and subject to Section 25 below, apply for specific performance and/or injunctive relief (without posting bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

19.     Amendment.  Except as otherwise provided herein, any provision of this Agreement may be amended or waived only with the prior written consent of you and the Company; provided that no provision of Section 12, 13, 14, 15, 16, 17, 18 or of this Section 19 may be amended or waived without the prior written consent of the Investors owning a majority of the Investor Stock.

20.     Successors and Assigns.   Except as otherwise expressly provided herein, all covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not.

21.     Severability.   Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

22.     Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same Agreement.

23.     Descriptive Headings.   The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

24.     Governing Law.  The corporate law of Delaware shall govern all questions concerning the relative rights of the Company and its stockholders.   All other questions concerning the construction, validity and interpretation of this Agreement shall be governed by the internal law, and not the law of conflicts, of Delaware.

25.     Arbitration.  Any controversy, dispute or claim arising out of or relating in any way to this Agreement or the other agreements contemplated hereby or the transactions arising hereunder or thereunder that cannot be resolved by negotiation shall be settled exclusively by arbitration in the City of Chicago, Illinois.  Such arbitration shall be administered by the

Center for Public Resources Institute for Dispute Resolutions (the "Institute") in accordance with its then prevailing Rules for Non-Administered Arbitration of Business Disputes (except as otherwise provided herein), by three independent and impartial arbitrators, one of whom shall be appointed by the Chairman of the Board and one of whom shall be appointed by you. Notwithstanding anything to the contrary provided in Section 24 above, the arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §1 et seq. The fees and expenses of the Institute and the arbitrators shall be shared equally by the parties and advanced by them from time to time as required; provided that at the conclusion of the arbitration, the arbitrators shall award costs, expenses (including the costs of the arbitration previously advanced and the fees and expenses of attorneys, accountants and other experts) and interest to the prevailing party. The arbitrators shall permit and facilitate such discovery as they shall determine appropriate in the circumstances, taking into account the needs of the parties and the desirability of making discovery expeditious and cost effective. You and the Company shall keep confidential any proprietary information, trade secrets or other non-public information disclosed in discovery. The arbitrators shall render their award within 90 days of the conclusion of the arbitration hearing. The arbitrators shall be expressly empowered to award to either party any consequential damages, lost profits or punitive damages in connection with any dispute between them arising out of or relating in any way to this Agreement or the other agreements contemplated hereby or the transactions arising hereunder or thereunder, and each party hereby irrevocably waives any objection to the recovery by the other party hereto of such damages. Notwithstanding anything to the contrary provided in this Section 25 and without prejudice to the above procedures, either party may apply to any court of competent jurisdiction for temporary injunctive or other provisional judicial relief if such action is necessary to avoid irreparable damage or to preserve the status quo until such time as the arbitration panel is convened and available to hear such party's request for temporary relief. The award rendered by the arbitrators shall be final and not subject to judicial review, and judgment thereon may be entered in any court of competent jurisdiction.

26.     Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally or mailed by certified or registered mail, return receipt requested and postage prepaid, to the recipient. Such notices, demands and other communications shall be sent to you and to the Company and the Investors at the addresses indicated below:

> If to the Optionee:
>
> Justine Mathews
> 1090 East Hibiscus Drive
> Bartow, Florida 33830
>
> If to the Company:
>
> MedAssist Holding, Inc.
> 1661 Lyndon Farm Court
> Louisville, Kentucky 40223

Attention:    President and Chief Executive Officer
Facsimile No.: 502.515.9964

If to the Investors:

RoundTable Healthcare Partners, L.P.
RoundTable Healthcare Investors, L.P.
c/o RoundTable Healthcare Management, LLC
272 E. Deerpath Road, Suite 350
Lake Forest, IL 60045
Attention:      Joseph F. Damico
                David J. Koo
Facsimile No.: 847.482.921

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

27.    Third-Party Beneficiary.    The Company and you acknowledge that the Investors are third-party beneficiaries under this Agreement.

28.    Entire Agreement.    Except as otherwise expressly set forth herein, this Agreement embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

*    *    *    *    *

Please execute the extra copy of this Agreement in the space below and return it to the Company's Secretary at its executive offices to confirm your understanding and acceptance of the agreements contained in this Agreement.

Very truly yours,

MEDASSIST HOLDING, INC.

By:

Name: Michael A. Shea
Title:   President and Chief Executive
Officer

Enclosures:    (1)    Extra copy of this Agreement
(2)    Copy of the Plan

The undersigned hereby acknowledges having read this Agreement and the Plan and hereby agrees to be bound by all provisions set forth herein and in the Plan.

Dated as of                          OPTIONEE

13-24-04

(Signature)

Printed Name:  Justine Mathews
Social Security Number: 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

MedAssist Stock Option Grant Agmt (11-18-04)

[Provision for Community Property Jurisdiction]

## CONSENT

The undersigned spouse of Justine Mathews hereby acknowledges that I have read the foregoing Stock Option Agreement and that I understand its contents. I am aware that the Agreement provides for the repurchase of my spouse's shares of Common Stock under certain circumstances and imposes other restrictions on the Transfer of such Common Stock. I agree that my spouse's interest in the Common Stock is subject to this Agreement and any interest I may have in such Common Stock shall be irrevocably bound by this Agreement and further that the my community property interest, if any, shall be similarly bound by this Agreement.

I am aware that the legal, financial and other matters contained in this Agreement are complex and I am free to seek advice with respect thereto from independent counsel. I have either sought such advice or determined after carefully reviewing this Agreement that I will waive such right.

_____
Spouse

_____
Witness