MedAssist Holding, Inc.
1661 Lyndon Farm Court
Louisville, KY 40223

December 14, 2004

Re:    <u>MedAssist Holding, Inc. (the "Company") Grant of Nonqualified Stock Option</u>

Dear Justine:

The Company is pleased to advise you that its Board of Directors has granted to you a stock option (an "<u>Option</u>"), as provided below, under the Company's 2003 Stock Option Plan (the "<u>Plan</u>"), a copy of which is attached hereto and incorporated herein by reference.

1.    <u>Definitions</u>. For the purposes of this Agreement, the following terms shall have the meanings set forth below:

"<u>Affiliate</u>" of any Person shall mean any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

"<u>Board</u>" shall mean the Board of Directors of the Company.

"<u>Cause</u>" shall mean (i) your theft or embezzlement, or attempted theft or embezzlement, of money or property of the Company, your perpetration or attempted perpetration of fraud, or your participation in a fraud or attempted fraud, on the Company or your unauthorized appropriation of, or your attempt to misappropriate, any tangible or intangible assets or property of the Company, (ii) any act or acts of disloyalty, misconduct or moral turpitude by you injurious to the interest, property, operations, business or reputation of the Company or your conviction of a crime the commission of which results in injury to the Company or (iii) your failure or inability (other than by reason of your Disability) to carry out effectively your duties and obligations to the Company or to participate effectively and actively in the management of the Company, as determined in the reasonable judgment of the Board.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute.

"<u>Committee</u>" shall mean the Stock Option Committee, or such other committee of the Board which may be designated by the Board to administer the Plan. The Committee shall be composed of two or more directors as appointed from time to time to serve by the Board. If for any reason the Committee shall not have been appointed by the Board, all authority and duties of the Committee under this Agreement shall be vested in and exercised by the Board.

MedAssist Stock Option Grant Agmt (01-03-05)

"Common Stock" means the Company's Voting Common Stock and Non-Voting Common Stock.

"Company" shall mean MedAssist Holding, Inc. a Delaware corporation, and (except to the extent the context requires otherwise) any subsidiary corporation of MedAssist Holding, Inc. as such term is defined in Section 425(f) of the Code.

"Disability" shall mean your inability, due to illness, accident, injury, physical or mental incapacity or other disability, to carry out effectively your duties and obligations to the Company or to participate effectively and actively in the management of the Company for a period of at least 90 consecutive days or for shorter periods aggregating at least 120 days (whether or not consecutive) during any twelve-month period, as determined in the reasonable judgment of the Board.

"Effective Date" shall mean December 14, 2004.

"Fair Market Value" of the Common Stock shall be determined by the Committee or, in the absence of the Committee, by the Board.

"Investor Stock" shall mean the Common Stock purchased by the Investors under that certain Purchase Agreement, dated as of May 1, 2003, by and among the Company and the Investors and that certain Securities Purchase Agreement, dated as of October 28, 2004, by and among the Company, the Investors and the other investors signatory thereto.

"Investors" shall mean RoundTable Healthcare Partners, L.P., a Delaware limited partnership, and RoundTable Healthcare Investors, L.P., a Delaware limited partnership, so long as each such Person continues to own shares of the Company's Common Stock.

"Non-Voting Common Stock" shall mean the Company's Non-Voting Common Stock, par value $.01 per share, or, in the event that the outstanding Non-Voting Common Stock is hereafter changed into or exchanged for different stock or securities of the Company, such other stock or securities.

"Option Shares" shall mean (i) all shares of Non-Voting Common Stock issued or issuable upon the exercise of the Option and (ii) all shares of Common Stock issued with respect to the Non-Voting Common Stock referred to in clause (i) above by way of stock dividend or stock split or in connection with any conversion, merger, consolidation or recapitalization or other reorganization affecting the Common Stock. Option Shares shall continue to be Option Shares in the hands of any holder other than you (except for the Company or the Investors and, to the extent that you are permitted to Transfer Option Shares pursuant to Section 14 or 16 hereof, purchasers pursuant to a public offering under the Securities Act), and each such transferee thereof shall succeed to the rights and obligations of a holder of Option Shares hereunder.

"Permitted Transferee" means your spouse and descendants (whether natural or adopted) and any trust or family limited partnership established solely for your benefit an/or the benefit of your spouse and/or descendants, but only if such Persons are not engaging in

competition with the Company or its Subsidiaries (as determined by the Board in its sole discretion).

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Public Sale" means any sale of Option Shares to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act.

"Registration Agreement" shall mean that certain Registration Agreement, dated as of May 1, 2003, by and among the Company and certain investors as amended from time to time.

"Sale of the Company" shall mean the sale of the Company (whether by merger, consolidation, sale of all or substantially all of its assets or sale of all of its outstanding capital stock) to a Person who is not controlling, controlled by or under common control with any 5% owner of the Company's outstanding capital stock and who is not the spouse, ancestor or descendant (by birth or adoption) of any such 5% owner of the Company's capital stock.

"Securities Act" shall mean the Securities Act of 1933, as amended, and any successor statute.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Transfer" means any sale, transfer, assignment, pledge or other disposition of (whether with or without consideration and whether voluntarily or involuntarily or by operation of law) any interest in such Person's Option Shares.

"Voting Common Stock" shall means the Company's Voting Common Stock, par value $.01 per share, or, in the event that outstanding Voting Common Stock is hereafter changed into or exchanged for different stock or securities of the Company, such other stock or securities.

2. Option.

(a) Terms. Your Option is for the purchase of up to 6,900 shares of Non-Voting Common Stock (the "Option Shares") at a price per share of $1.34 (the "Exercise Price"), payable upon exercise as set forth in Section 2(b) below. Your Option shall expire at the close of business on December 14, 2014 (the "Expiration Date"), subject to earlier expiration as provided in Section 3(c) below or upon termination of your employment as provided in Section 4(b) below. Your Option is not intended to be an "incentive stock option" within the meaning of Section 422A of the Code.

(b) Payment of Option Price. Subject to Section 3 below, your Option may be exercised in whole or in part upon payment of an amount (the "Option Price") equal to the product of (x) the Exercise Price multiplied by (y) the number of Option Shares to be acquired. Payment shall be made in cash (including check, bank draft or money order) or, in the discretion of the Committee, by (i) delivery of a promissory note, (ii) surrendering Non-Voting Common Stock that you have owned for at least six months and that has a Fair Market Value equal to the exercise price, (iii) delivery of an irrevocable undertaking by a broker to deliver promptly to the Company sufficient funds to pay the exercise price, or (iv) any combination of the foregoing (in each case, if in accordance with policies approved by the Board).

3. Exercisability/Vesting.

(a) Normal Vesting. Your Option may be exercised only to the extent it has become vested. Your Option shall fully vest and become exercisable with respect to all of your Option Shares on the fifth anniversary of the Effective Date, *if and only if* you are, and have been, continuously employed by the Company from the Effective Date through the fifth anniversary of the Effective Date.

Notwithstanding the foregoing, your Option shall vest and become exercisable with respect to 25% of your Option Shares (rounded to the nearest whole share) on the second, third, and fourth anniversaries of the Effective Date, respectively, *if and only if* you are, and have been, continuously employed by the Company from the Effective Date through the second, third and fourth anniversaries, as applicable.

(b) Effect on Vesting in Case of Employment Termination. Notwithstanding Section 3(a) above, the following special vesting rules shall apply if your employment with the Company terminates prior to the Expiration Date:

(i) Death or Disability. If you die or become subject to any Disability while an employee of the Company, your Option shall be vested and become fully exercisable with respect to a number of Option Shares equal to the sum of (x) the Option Shares that were exercisable on the date of your death or Disability, plus (y) 25% of the

Option Shares that were not exercisable on the date of your death or Disability. Your Option with respect to the remaining Option Shares that were not exercisable on the date of your death or Disability shall expire and be forfeited.

    (ii)  Retirement. If you retire (with the approval of the Committee or the Board) from employment with the Company, your Option shall be vested and fully exercisable with respect to that portion of your Option that was exercisable on the date of your retirement. Any portion of your Option that was not exercisable on the date of your retirement shall expire and be forfeited.

    (iii)  Other Termination of Employment. Unless otherwise determined by the Committee, if your employment terminates other than as a result of death, Disability, retirement (with the approval of the Committee or the Board), resignation or discharge for Cause, your Option shall be vested and fully exercisable with respect to that portion of your Option that was vested and exercisable on the date your employment with the Company ceased and any portion of your Option that was not vested and exercisable on such date shall expire and be forfeited. If you resign or are discharged for Cause, all of your Option not previously exercised shall expire and be forfeited whether exercisable or not.

  Except as provided in this Section 3(b), the number of Option Shares with respect to which your Option may be exercised shall not increase once you cease to be employed by the Company.

  (c)  Acceleration of Vesting on Sale of the Company. If you have been continuously employed by the Company from the Effective Date until a Sale of the Company, the portion of your outstanding Option which has not become vested at the date of such event shall, at Board's sole discretion, immediately vest and become exercisable with respect to 100% of the Option Shares simultaneously with the consummation of the Sale of the Company. In any event, any portion of your Option which has not been exercised prior to or in connection with the Sale of the Company shall be forfeited, unless otherwise determined by the Committee or the Board.

  4.  Expiration of Option.

  (a)  Normal Expiration. In no event shall any part of your Option be exercisable after the Expiration Date set forth in Section 2(a) above.

  (b)  Early Expiration Upon Termination of Employment. Any portion of your Option that was not vested and exercisable on the date your employment with the Company terminated shall expire and be forfeited on such date, and any portion of your Option that was vested and exercisable on the date your employment with the Company terminated shall also expire and be forfeited; provided that: (i) if you die or become subject to any Disability, the portion of your Option that is vested and exercisable shall expire 180 days from the date of your death or Disability, but in no event after the Expiration Date, (ii) if you retire (with the approval of the Committee or the Board), the portion of your Option that is vested and exercisable shall expire 90 days from the date of your retirement, but in no event after the Expiration Date, and

(iii) if you are discharged other than for Cause, the portion of your Option that is vested and exercisable shall expire 30 days from the date of your discharge, but in no event after the Expiration Date.

5. Procedure for Exercise. You may exercise all or any portion of your Option, to the extent it has vested and is outstanding, at any time and from time to time prior to its expiration, by delivering written notice to the Company (to the attention of the Company's Secretary) and your written acknowledgement that you have read and have been afforded an opportunity to ask questions of management of the Company regarding all financial and other information provided to you regarding the Company, together with payment of the Option Price in accordance with the provisions of Section 2(b) above. As a condition to any exercise of your Option, you shall permit the Company to deliver to you all financial and other information regarding the Company it believes necessary to enable you to make an informed investment decision, and you shall make all customary investment representations which the Company requires.

6. Securities Laws Restrictions and Other Restrictions on Transfer of Option Shares. You represent that when you exercise your Option you shall be purchasing Option Shares for your own account and not on behalf of others. You understand and acknowledge that federal and state securities laws govern and restrict your right to offer, sell or otherwise dispose of any Option Shares unless your offer, sale or other disposition thereof is registered under the Securities Act and state securities laws, or in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder. You agree that you shall not offer, sell or otherwise dispose of any Option Shares in any manner which would: (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law) or to amend or supplement any such filing or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other state or federal law. You further understand that the certificates for any Option Shares you purchase shall bear such legends as the Company deems necessary or desirable in connection with the Securities Act or other rules, regulations or laws.

7. Non-Transferability of Option. Your Option is personal to you and is not transferable by you other than by will or the laws of descent and distribution. During your lifetime only you (or your guardian or legal representative) may exercise your Option. In the event of your death, your Option may be exercised only (i) by the executor or administrator of your estate or the person or persons to whom your rights under the Option shall pass by will or the laws of descent and distribution and (ii) to the extent that you were entitled hereunder at the date of your death.

8. Conformity with Plan. Your Option is intended to conform in all respects with, and is subject to all applicable provisions of, the Plan (which is incorporated herein by reference). Inconsistencies between this Agreement and the Plan shall be resolved in accordance with the terms of the Plan. By executing and returning the enclosed copy of this Agreement, you acknowledge your receipt of this Agreement and the Plan and agree to be bound by all of the terms of this Agreement and the Plan.

9. **Rights of Participants**. Nothing in this Agreement shall interfere with or limit in any way the right of the Company to terminate your employment at any time (with or without Cause), nor confer upon you any right to continue in the employ of the Company for any period of time or to continue your present (or any other) rate of compensation, and in the event of your termination of employment (including, but not limited to, termination by the Company without Cause) any portion of your Option that was not previously vested and exercisable shall be forfeited. Nothing in this Agreement shall confer upon you any right to be selected again as a Plan participant, and nothing in the Plan or this Agreement shall provide for any adjustment to the number of Option Shares subject to your Option upon the occurrence of subsequent events except as provided in Section 11 below.

10. **Withholding of Taxes**. The Company shall be entitled, if necessary or desirable, to withhold from you from any amounts due and payable by the Company to you (or secure payment from you in lieu of withholding) the amount of any withholding or other tax due from the Company with respect to any Option Shares issuable under this Plan, and the Company may defer such issuance unless indemnified by you to its satisfaction.

11. **Adjustments**. In the event of a reorganization, recapitalization, stock dividend or stock split, or combination or other change in the shares of Common Stock, the Board or the Committee may, in order to prevent the dilution or enlargement of rights under your Option, make such adjustments in the number and type of shares authorized by the Plan, the number and type of shares covered by your Option and the Exercise Price specified herein as may be determined to be appropriate and equitable.

12. **Right to Purchase Option Shares Upon Your Termination of Employment**.

(a) **Repurchase of Option Shares**. If your employment with the Company shall terminate, including upon your death, Disability, resignation or termination with or without Cause (the date on which such termination occurs being referred to as the "Termination Date"), then the Company shall have the option to repurchase all or any part of the Option Shares issued or issuable upon exercise of your Option, whether held by you or by one or more of your transferees, at the price determined in accordance with the provisions of Section 13 hereof (the "Repurchase Option").

(b) **Repurchase by Company**. The Company may elect to purchase all or any portion of the Option Shares by delivery of written notice (the "Repurchase Notice") to you or any other holders of the Option Shares within 90 days after the Termination Date. The Repurchase Notice shall set forth the number of Option Shares to be acquired from you and such other holder(s), the aggregate consideration to be paid for such shares and the time and place for the closing of the transaction. The number of Option Shares to be repurchased by the Company shall first be satisfied to the extent possible from the Option Shares held by you at the time of delivery of the Repurchase Notice. If the number of Option Shares then held by you is less than the total number of Option Shares the Company has elected to purchase, then the Company shall purchase the remaining shares elected to be purchased from the other holders thereof, pro rata according to the number of shares held by each such holder at the time of delivery of such Repurchase Notice (determined as close as practical to the nearest whole shares).

(c)     Repurchase by Investors. If for any reason the Company does not elect to purchase all of the Option Shares pursuant to the Repurchase Option, then the Investors shall be entitled to exercise the Company's Repurchase Option in the manner set forth in Section 12(a) for all or any portion of the number of Option Shares the Company has not elected to purchase (the "Available Shares"). As soon as practicable after the Company has determined that there shall be Available Shares, but in any event within 60 days after the Termination Date, the Company shall deliver written notice (the "Option Notice") to the Investors setting forth the number of Available Shares and the price for each Available Share. Each Investor may elect to purchase any number of Available Shares by delivering written notice to the Company within 30 days after receipt of the Option Notice from the Company. If more than one Investor elects to purchase the Available Shares and such elections exceed the number of Available Shares, the number of Available Shares to be purchased by the electing Investors shall be allocated among them pro rata based upon their relative percentage ownership of Investor Stock. As soon as practicable, and in any event within five days after the expiration of such 30-day period, the Company shall notify you and any other holder(s) of Option Shares as to the number of Option Shares being purchased from you by the Investors (the "Supplemental Repurchase Notice"). At the time the Company delivers the Supplemental Repurchase Notice to you and such other holder(s) of Option Shares, the Investors shall also receive written notice from the Company setting forth the number of shares it is entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction.

(d)     Closing of Repurchase of Option Shares. The purchase of Option Shares pursuant to this Section 12 shall be closed at the Company's executive offices within 20 days after the expiration of the 90-day period referred to in Section 12(b). At the closing, the purchaser or purchasers shall pay the purchase price in the manner specified in Section 13(b) and you and any other holders of Option Shares being purchased shall deliver the certificate or certificates representing such shares to the purchaser or purchasers or their nominees, accompanied by duly executed stock powers. Any purchaser of Option Shares under this Section 12 shall be entitled to receive customary representations and warranties from you and any other selling holders of Option Shares regarding the sale of such shares (including representations and warranties regarding good title to such shares, free and clear of any liens or encumbrances) and to require all sellers' signatures to be guaranteed by a national bank or reputable securities broker.

13.     Purchase Price for Option Shares.

(a)     Purchase Price. The purchase price per share to be paid for the Option Shares purchased by the Company and the Investors pursuant to Section 12 shall be equal to the Fair Market Value of such Option Shares as of the Termination Date.

(b)     Manner of Payment. If the Company elects to purchase all or any part of the Option Shares, including Option Shares held by one or more transferees, the Company shall pay for such shares by, at its option: (i) a check or wire transfer of funds to the extent such payment would not cause the Company to violate the General Corporation Law of the State of Delaware and would not cause the Company to breach any agreement to which it is a party relating to the indebtedness for borrowed money or other material agreement; (ii) a subordinated

promissory note of the Company bearing interest (payable quarterly in cash unless otherwise prohibited) at the rate of 6% per annum, with a principal payment due on the fifth anniversary of the date of issuance and which shall be subordinated on terms and conditions satisfactory to the holders of the Company's indebtedness for borrowed money; or (iii) a combination of (i) and (ii) above in such proportions as the Company may determine in its sole discretion. In addition, the Company may pay the purchase price for such shares by offsetting amounts outstanding under any indebtedness or obligations owed by you to the Company. If any Investors elect to purchase all or any portion of the Available Shares, such Investors shall pay for that portion of such Option Shares by check or wire transfer of funds.

14.  Restrictions on Transfer.

(a)  With respect to each Option Share issued pursuant to this Agreement, until the third anniversary of the date of the issuance of such Option Share, you shall not Transfer any interest in such Option Share except pursuant to the provisions of Section 14 below (in an Approved Sale). After the third anniversary of the date of issuance and prior to the fifth anniversary of the date of issuance, you shall not Transfer any interest in such Option Share except (a) pursuant to the immediately preceding sentence or (b) to your Permitted Transferees. After the fifth anniversary of the date of issuance, you shall not Transfer any interest in such Option Share except (a) pursuant to the immediately preceding sentence (each, an Exempt Transfer") or (b) pursuant to a Transfer consummated in compliance with the terms of this Section 14 hereof to Persons that are not engaging in competition with the Company or its Subsidiaries (as determined by the Board in its reasonable discretion).

(b)  Transfer of Option Shares. At least 30 days prior to making any Transfer other than an Exempt Transfer, you shall deliver a written notice (the "Sale Notice") to the Company and the Investors. The Sale Notice shall disclose in reasonable detail the identity of the prospective transferee(s) and the terms and conditions of the proposed Transfer. You agree not to consummate any such Transfer until 30 days after the Sale Notice has been delivered to the Company and the Investors, unless the parties to the Transfer have been finally determined pursuant to this Section 14 prior to the expiration of such 30-day period. (The date of the first to occur of such events is referred to herein as the "Authorization Date").

(c)  First Refusal Rights. The Company may elect to purchase all (but not less than all) of the Option Shares to be transferred by you upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to you within 20 days after the receipt of the Sale Notice by the Company. If the Company has not elected to purchase all of the Option Shares to be transferred, then the Investors may elect to purchase all (but not less than all) of the Option Shares to be transferred upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to you within 30 days after the receipt of the Sale Notice by the Investors. Any person who has the right to acquire Option Shares pursuant to this Section 14(b) shall be given up to 30 days (after it has been determined that such person has such right) to consummate the purchase and sale of Option Shares. If more than one Investor Stockholder elects to purchase the Option Shares specified in the Sale Notice and such elections exceed the number of remaining shares, then the number of Option Shares to be purchased by the electing Investors shall be allocated among them pro rata

based upon their relative percentage ownership of Investor Stock. If neither the Company nor any Investor Stockholder has elected to purchase all of the Option Shares specified in the Sale Notice, you may Transfer the Option Shares specified in the Sale Notice at a price and on terms no more favorable to the transferee(s) thereof than specified in the Sale Notice during the 60-day period immediately following the Authorization Date. Any Option Shares not transferred within such 60-day period shall be subject to the provisions of this Section 14(b) upon subsequent Transfer.

(d)    Termination of Restrictions. The restrictions on the Transfer of Option Shares set forth in Sections 14(b) and 14(c) shall terminate on the earlier to occur of (i) the date on which such Option Share has been transferred in a Public Sale, (ii) the consummation of an Approved Sale and (iii) the date on which such Option Share has been transferred pursuant to Section 14(c) above.

15.    Additional Restrictions on Transfer.

(a)    Restrictive Legend. When issued upon the valid exercise of your Option pursuant to the terms and conditions hereof, the certificates representing the Option Shares shall bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____ \_\_, 20\_\_ HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN AN OPTION AGREEMENT BETWEEN THE COMPANY AND _____ EFFECTIVE AS OF MAY 1, 2003, A COPY OF WHICH MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(b)    Opinion of Counsel. You may not Transfer any Option Shares (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Company an opinion of counsel reasonably acceptable in form and substance to the Company that registration under the Securities Act or any applicable state securities law is not required in connection with such Transfer.

(c)    Holdback. You agree not to effect any public sale or distribution of any equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, during the seven days prior to and the 180 days after the effectiveness of any underwritten Demand Registration or any underwritten Piggyback

Registration (as such terms are defined in the Registration Agreement), except as part of such underwritten registration if otherwise permitted.

16. Sale of the Company.

(a) Consent to Sale of Company. If the Board and the holders of a majority of the Company's Voting Common Stock then outstanding approve a Sale of the Company (the "Approved Sale"), you shall consent to and raise no objections against the Approved Sale of the Company, and if the Approved Sale of the Company is structured as a sale of stock, reverse merger, or other transaction having the effect of a stock sale, you shall agree to sell all of your Option Shares and rights to acquire Option Shares on the terms and conditions approved by the Board and the holders of a majority of the Voting Common Stock then outstanding. You shall take all necessary and desirable actions in connection with the consummation of the Approved Sale of the Company.

(b) Purchaser Representative. If the Company or the holders of the Company's securities enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), you shall, at the request of the Company, appoint a purchaser representative (as such term is defined in Rule 501) reasonably acceptable to the Company. If you appoint the purchaser representative designated by the Company, the Company shall pay the fees of such purchaser representative, but if you decline to appoint the purchaser representative designated by the Company you shall appoint another purchaser representative (reasonably acceptable to the Company), and you shall be responsible for the fees of the purchaser representative so appointed.

(c) Termination of Restrictions. The provisions of this Section 16 shall terminate when the Company has sold shares of its Common Stock pursuant to a public offering registered under the Securities Act.

17. Restrictive Covenants.

(a) Non-Disclosure of Confidential Information. You will not at any time (other than disclosures to other employees, officers and/or directors of the Company, or as may be required or appropriate directly in connection with your performance of your regular employment duties), directly or indirectly, use, communicate, disclose or disseminate any Confidential Information (defined below) in any manner whatsoever (except as may be required under legal process by subpoena or other court order). You agree to take all appropriate steps (and cause each of your Affiliates to take all appropriate steps) to safeguard such Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. If you are requested or becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigation demand, or similar process) or are required by a regulatory body to make any disclosure that is prohibited or otherwise constrained by this Agreement, you will provide the Company with prompt notice of such request so that the Company may seek an appropriate protective order or other appropriate remedy. Subject to the foregoing, you may furnish that portion (and only that portion) of the Confidential

MedAssist Stock Option Grant Agrm (01-03-05)    -11-

Information, that in the written opinion of your counsel reasonably acceptable to the Company, you are legally compelled or are otherwise required to disclose or else stand liable for contempt or suffer other material censure or material penalty; provided, however, that you must use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any Confidential Information so disclosed.

(b) "Confidential Information" Defined. For purposes of this Agreement, "Confidential Information" means information relating to the present or planned business of the Company, or any of its divisions, Subsidiaries or Affiliates, unless and to the extent that the Confidential Information becomes generally known to and available for use by the public other than as a result of your acts or omissions. You understand and agree that Confidential Information also includes, but is not limited to, the Company's, or any of its divisions', Subsidiaries' or Affiliates' business methods, company/employee manuals, client fee arrangements, management practices, advertisement techniques, market development projects, the relationships with various clients and potential clients, Trade Secrets (defined below) and know-how, Inventions (defined below), research, development, marketing and sales programs, customer, patient and supplier information, financial data, pricing information, manufacturing processes and techniques, regulatory approval strategies, computer programs, data, formulae and compositions, service techniques and protocols, and new product designs, anything derived from or based upon any of the foregoing and any information received by the Company, or any of its divisions, Subsidiaries or Affiliates, under an obligation of confidentiality to a third party.

For purposes of this Agreement, "Invention" means both patentable and unpatentable procedures, uses, apparatuses, compositions or matter, designs, or configurations, computer programs of any kind, discovered, conceived, reduced to practice, developed, made or produced, or any improvements to them. "Items" include documents, reports, drawings, photographs, designs, specifications, formulae, plans, samples, research or development information, prototypes, tools, equipment, computers, printers, monitors and associated other computer-related equipment, software, proposals, marketing or sales plans, customer information, customer lists, patient lists, patient information, regulatory files, financial data, costs, pricing information, supplier information, written, printed or graphic matter, or other information or materials that concern the Company's, or its divisions', Subsidiaries' or Affiliates', business and that come into your possession or about which you have knowledge by reason of your employment with the Company. "Trade Secrets" include all information encompassed in all Items, and in all manufacturing processes, methods of production, concepts or ideas, to the extent that such information has not been released publicly by duly authorized representatives of the Company.

(c) Non-Competition, Non-Solicitation and Related Covenants. You acknowledge and agree that the Company would be irreparably damaged if you were to compete with the Company or provide services to any person or entity competing with the Company or engaged in a similar business and that such competition by you would result in a significant loss of goodwill by the Company. You further acknowledge and agree that the covenants set forth in this Section 17 were a material inducement to the Company to enter into this Agreement and that the Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if you breached the provisions of this Section 17.

Therefore, during your employment with the Company and for a period of two years thereafter (the "Restricted Period") regardless of whether you were terminated for cause or not), without the express, prior written consent of the Company, you shall not engage in any of the conduct described in subsections (i)-(v) below, either directly or indirectly, individually or as an employee, contractor, consultant, partner, member, officer, director or stockholder (other than as a stockholder of less than 5% of the equities of a publicly traded corporation) or in any other capacity for any person, firm, partnership, limited liability company or corporation:

      (i)    engage in, participate in, or permit your name to be used by any enterprise engaging in or participating in the business of patient eligibility, accounts receivable management and collection services to the health care industry, and any other industry in which the Company conducts business in the United States;

      (ii)    induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way materially interfere with the relationship between the Company or any Subsidiary and any employee thereof, in each case, except as otherwise consistent with your regular employment duties prior to the termination of your employment;

      (iii)    hire any person who was an employee of the Company or any Subsidiary at any time during the six-month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the parties that any such hiring within such twelve-month period is in violation of this clause (ii) above);

      (iv)    call on, solicit or service any customer, supplier, independent contractor or other business relation of the Company or any Subsidiary in order to induce or attempt to induce such customer, supplier, independent contractor or other business relation to cease doing business with the Company or any Subsidiary, or in any way materially interfere with the relationship between any such customer, supplier, independent contractor or business relation and the Company or any Subsidiary (including any disparaging statements about the Company or any Subsidiary), in each case, except as otherwise consistent with your regular employment duties prior to the termination of your employment; or

      (v)    participate voluntarily with or provide assistance or information to any person or entity that is involved in a potential or existing business or legal dispute with the Company, its divisions, Subsidiaries or Affiliates, including, but not limited, to litigation, except as may be required by law. In the event you receive a complaint or subpoena or other legal process relating to your employment with the Company, you, within seven days of receipt and prior to your response, shall give written notice to the Company as provided in Section 26 below.

    (d)    Reasonable Limitations. The parties hereto stipulate and agree that each of the terms of Section 17 of this Agreement including, but not limited to, the scope of the activities prohibited and the time limitation, is reasonable. You further stipulate that the

foregoing restrictions will not prevent you from obtaining gainful employment in your occupation or file of expertise or cause you undue hardship.

18. <u>Remedies</u>. The parties hereto (and the Investors as third-party beneficiaries) shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto acknowledge and agree that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party hereto (and any Investor Stockholder as a third-party beneficiary) may, in its sole discretion and subject to <u>Section 25</u> below, apply for specific performance and/or injunctive relief (without posting bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

19. <u>Amendment</u>. Except as otherwise provided herein, any provision of this Agreement may be amended or waived only with the prior written consent of you and the Company; provided that no provision of <u>Section 12, 13, 14, 15, 16, 17, 18</u> or of this <u>Section 19</u> may be amended or waived without the prior written consent of the Investors owning a majority of the Investor Stock.

20. <u>Successors and Assigns</u>. Except as otherwise expressly provided herein, all covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not.

21. <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

22. <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same Agreement.

23. <u>Descriptive Headings</u>. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

24. <u>Governing Law</u>. The corporate law of Delaware shall govern all questions concerning the relative rights of the Company and its stockholders. All other questions concerning the construction, validity and interpretation of this Agreement shall be governed by the internal law, and not the law of conflicts, of Delaware.

25. <u>Arbitration</u>. Any controversy, dispute or claim arising out of or relating in any way to this Agreement or the other agreements contemplated hereby or the transactions arising hereunder or thereunder that cannot be resolved by negotiation shall be settled exclusively by arbitration in the City of Chicago, Illinois. Such arbitration shall be administered by the

Center for Public Resources Institute for Dispute Resolutions (the "Institute") in accordance with its then prevailing Rules for Non-Administered Arbitration of Business Disputes (except as otherwise provided herein), by three independent and impartial arbitrators, one of whom shall be appointed by the Chairman of the Board and one of whom shall be appointed by you. Notwithstanding anything to the contrary provided in Section 24 above, the arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. §1 *et seq*. The fees and expenses of the Institute and the arbitrators shall be shared equally by the parties and advanced by them from time to time as required; provided that at the conclusion of the arbitration, the arbitrators shall award costs, expenses (including the costs of the arbitration previously advanced and the fees and expenses of attorneys, accountants and other experts) and interest to the prevailing party. The arbitrators shall permit and facilitate such discovery as they shall determine appropriate in the circumstances, taking into account the needs of the parties and the desirability of making discovery expeditious and cost effective. You and the Company shall keep confidential any proprietary information, trade secrets or other non-public information disclosed in discovery. The arbitrators shall render their award within 90 days of the conclusion of the arbitration hearing. The arbitrators shall be expressly empowered to award to either party any consequential damages, lost profits or punitive damages in connection with any dispute between them arising out of or relating in any way to this Agreement or the other agreements contemplated hereby or the transactions arising hereunder or thereunder, and each party hereby irrevocably waives any objection to the recovery by the other party hereto of such damages. Notwithstanding anything to the contrary provided in this Section 25 and without prejudice to the above procedures, either party may apply to any court of competent jurisdiction for temporary injunctive or other provisional judicial relief if such action is necessary to avoid irreparable damage or to preserve the status quo until such time as the arbitration panel is convened and available to hear such party's request for temporary relief. The award rendered by the arbitrators shall be final and not subject to judicial review, and judgment thereon may be entered in any court of competent jurisdiction.

26. Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally or mailed by certified or registered mail, return receipt requested and postage prepaid, to the recipient. Such notices, demands and other communications shall be sent to you and to the Company and the Investors at the addresses indicated below:

If to the Optionee:

Justine Mathews
1090 East Hibiscus Drive
Bartow, Florida 33830

If to the Company:

MedAssist Holding, Inc.
1661 Lyndon Farm Court
Louisville, Kentucky 40223

      Attention:    President and Chief Executive Officer
Facsimile No.: 502.515.9964

If to the Investors:

RoundTable Healthcare Partners, L.P.
RoundTable Healthcare Investors, L.P.
c/o RoundTable Healthcare Management, LLC
272 E. Deerpath Road, Suite 350
Lake Forest, IL 60045
Attention:    Joseph F. Damico
                  David J. Koo
Facsimile No.: 847.482.921

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

      27.    Third-Party Beneficiary. The Company and you acknowledge that the Investors are third-party beneficiaries under this Agreement.

      28.    Entire Agreement. Except as otherwise expressly set forth herein, this Agreement embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

\* \* \* \* \*

Please execute the extra copy of this Agreement in the space below and return it to the Company's Secretary at its executive offices to confirm your understanding and acceptance of the agreements contained in this Agreement.

Very truly yours,

MEDASSIST HOLDING, INC.

By: _____
Name: Michael A. Shea
Title: President and Chief Executive Officer

Enclosures: (1) Extra copy of this Agreement
(2) Copy of the Plan

The undersigned hereby acknowledges having read this Agreement and the Plan and hereby agrees to be bound by all provisions set forth herein and in the Plan.

Dated as of

12-24-04

OPTIONEE

_____
(Signature)

Printed Name: Justine Mathews
Social Security Number: 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

MedAssist Stock Option Grant Agmt (11-18-04)

[Provision for Community Property Jurisdiction]

## CONSENT

The undersigned spouse of Justine Mathews hereby acknowledges that I have read the foregoing Stock Option Agreement and that I understand its contents. I am aware that the Agreement provides for the repurchase of my spouse's shares of Common Stock under certain circumstances and imposes other restrictions on the Transfer of such Common Stock. I agree that my spouse's interest in the Common Stock is subject to this Agreement and any interest I may have in such Common Stock shall be irrevocably bound by this Agreement and further that the my community property interest, if any, shall be similarly bound by this Agreement.

I am aware that the legal, financial and other matters contained in this Agreement are complex and I am free to seek advice with respect thereto from independent counsel. I have either sought such advice or determined after carefully reviewing this Agreement that I will waive such right.

_____
Spouse

_____
Witness

MedAssist Stock Option Grant Agmt (11-18-04)



# COZEN
# O'CONNOR
## ATTORNEYS

A PROFESSIONAL CORPORATION

SUITE 1400   CHASE MANHATTAN CENTRE   1201 NORTH MARKET STREET   WILMINGTON, DE 19801-1147
302.295.2000   888.207.2440   302.295.2013 FAX   www.cozen.com

October 3, 2006

**David A. Felice**
Direct Phone 302.295.2011
Direct Fax    866.776.8911
dfelice@cozen.com

Dr. Peter T. Dalleo
Clerk of the Court
U.S. District Court, District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801

Re:   *Justine Mathews v. MedAssist, Inc.*
      C.A. No. 06-574-JJF

Dear Dr. Dalleo:

Enclosed please find a supplement to Exhibit A to the Complaint in the above-referenced matter. Please include this supplement as part of the record. (D.I. 1).

Thank you for your attention to this matter, and if you should have any questions or concerns about this matter, please feel free to contact me at any time.

Respectfully,

David A. Felice (#4090)

DAF/ssl
Enclosures

cc:   MedAssist, Inc. (c/o National Registered Agents, Inc.)

WILMINGTON\36717\1178190.000